[Crim. No. 19660. Aug. 31, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT GAINER, JR., Defendant and Appellant.

838

## Counsel

Craig Harris Collins, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein, W. Eric Collins, Derald E. Granberg and David Schneller, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MOSK, J.**—In January 1975 defendant Robert Gainer, Jr., was tried in the Superior Court of Contra Costa County on a charge of murder. (Pen. Code, § 187.)[1] The taking of the testimony of more than 30 witnesses consumed 12 days, concluding on the 28th of January. On the 13th day of trial, at 10:30 in the morning, the case went to the jury. Four times during that day the jury interrupted their deliberations to ask that various portions of the testimony be reread. At 5:05 p.m. the jurors were sent home without having reached a verdict.

On the morning of their second day of deliberations the jurors again heard testimony read by request, and returned to the jury room. At 4:45 p.m., when the jury sent in a note asking for the rereading of an instruction, the trial judge inquired as to the numerical division of the panel. He was informed that the last ballot stood nine to three. The jurors, having failed to agree, again were excused and permitted to return home for the night.

On the morning of January 31, the 15th day of trial and the 3d day of deliberations, the jury heard one witness' testimony read and continued deliberating. At 11 a.m. the jurors were reassembled in the courtroom where the foreman indicated they were having difficulty in reaching a verdict. The judge again inquired as to their numerical count, and the foreman replied, "Eleven to one." At this point the judge read the following instruction:

"Ladies and Gentlemen of the Jury:

---

[1]Defendant was also charged with being armed with a deadly weapon at the time of the offense and with using a firearm in committing the crime. (Pen. Code, §§ 12022, 12022.5.)

"In a large proportion of cases and perhaps strictly speaking, in all cases, absolute certainty cannot be attained or expected. Although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions and not a mere acquiescence in the conclusion of his or her fellows, yet in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And, with this view, it is your duty to decide the case, if you can conscientiously do so.

"In order to make a decision more practicable, the law imposes the burden of proof on one party or the other in all cases. In the present case, the burden of proof is on the People of the State of California to establish every part of it beyond a reasonable doubt. And, if in any part of it you are left in doubt, the defendant is entitled to the benefit of the doubt and must be acquitted. But in conferring together, you ought to pay proper respect to each other's opinions and listen with a disposition to be convinced to each other's arguments.

"And, on the other hand, if much the larger of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women equally honest, equally intelligent with himself or herself, and [who] have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath.

"And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows.

"That is given to you as a suggestion of the theory and rationale behind jurors coming to a decision one way or the other.

"So, Ladies and Gentlemen of the Jury, I'm going to ask you—after lunch—to retire and continue with your deliberations and see if it is at all possible to resolve the matter.

"I understand that, of course, on occasions it is impossible to do so, but—based upon the instruction I have just given to you—I would appreciate that after lunch—if you would go back and resume your deliberations and see if you can arrive at a verdict and that the deadlock can be broken."

After lunch—a total of 2 hours and 55 minutes after resuming deliberations—the jury returned a verdict of guilty of murder in the second degree, with a finding that defendant was armed with a deadly weapon at the time of the offense and that he used a firearm in committing the offense.

 On appeal from the judgment entered on this verdict, we consider for the first time the permissibility of the final instruction given to the jury shortly before they returned a verdict on the third day of deliberations.[2] The instruction, which is of a type commonly referred to either as the *"Allen* charge" or the "dynamite charge," has had a controversial history since it was cursorily approved by the United States Supreme Court in the case of *Allen* v. *United States* (1896) 164 U.S. 492 [41 L.Ed. 528, 17 S.Ct. 154]. Because it instructs the jury to consider extraneous and improper factors, inaccurately states the law, carries a

---

[2]Defense counsel objected to the charge immediately after the jury retired. Nevertheless, the People contend that defendant "acquiesced" in the decision to give the instruction for a deliberate tactical purpose, and hence that any objection was waived. (See *People* v. *Graham* (1969) 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153].) The People point to no expressions of counsel in the record which substantiate their speculation that Gainer's attorney "surmised" that the jury stood 11 to 1 for acquittal and therefore acceded to the instruction in question. To compensate for this evidentiary void, the People invite us to infer a deliberate acquiescence from defendant's failure to object to the instruction in advance or in mid-passage. Again, however, the record fails to contradict defense counsel's statement, after the charge was read, that "I was not even asked nor was it ever indicated to me that the instruction was ever to be given in this case." Clearly defendants cannot be required to anticipate supplemental instructions a judge might give, upon pain of inviting error. Nor was defense counsel required to interrupt the judge's charge at every controversial phrase, thereby courting the animosity of the jury and implying that the charge hurt his client's case. Indeed common courtesy, and respect for the dignity of judicial proceedings, caution against interruption of a judge who is advising the jury.

potentially coercive impact, and burdens rather than facilitates the administration of justice, we conclude that further use of the charge should be prohibited in California.

In reviewing defendant's contention that the charge was erroneous as a matter of law, it will be helpful to trace the history of the instruction from its relatively innocuous origin, through its heyday as a popular technique for extracting verdicts from deadlocked juries, and into its twilight years as a prolific generator of appellate controversy. In the process we shall identify and assess those aspects of the charge which are the central objects of defendant's attack.

### Genesis of the "Allen Charge"

The *Allen* case from which the instruction takes its name is a most unprepossessing leading authority. Alexander Allen was a 14-year-old boy who had been convicted of murder. His conviction was reversed by the United States Supreme Court because of a faulty jury instruction (*Allen* v. *United States* (1893) 150 U.S. 551 [37 L.Ed. 1179, 14 S.Ct. 196]), and after a retrial his second conviction was reversed by the Supreme Court because of another erroneous instruction (*Allen* v. *United States* (1895) 157 U.S. 675 [39 L.Ed. 854, 15 S.Ct. 720]). After a third conviction his case went again to the Supreme Court. (*Allen* v. *United States* (1896) 164 U.S. 492 [41 L.Ed. 528, 17 S.Ct. 154].) No counsel appeared for Allen, and the court declared itself "somewhat embarrassed . . . by the absence of a brief on the part of the plaintiff in error . . . ." (*Id.,* at p. 494 [41 L.Ed. at p. 528].) Nevertheless, the court did consider 18 assignments of error in the record, the last 2 of which concerned the instruction now known as the "*Allen* charge." The court noted that the instruction was "taken literally from a charge in a criminal case which was approved of by the Supreme Court of Massachusetts in *Commonwealth* v. *Tuey,* 8 Cush. 1 . . . ." (*Id.* at p. 501 [41 L.Ed. at p. 531].)[3]

---

[3]The court summarized the charge as being, "in substance, that in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority." (*Ibid.* [41 L.Ed. at pp. 530-531])

After paraphrasing the instruction, the court reasoned that "While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury-room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury-room with a blind determination that the verdict shall represent his opinion of the case at ·that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself. There was no error in these instructions." (*Id.* at pp. 501-502 [41 L.Ed. at p. 531].)

Given this procedural history, and the *Allen* court's brief treatment of the elaborately crafted collection of nuances and intimations composing the challenged instruction, "there is little wonder that many doubt whether the case would not be decided differently today. [Citation.] But that it should have become the foundationstone of all modern law regarding deadlocked juries is perhaps the greatest anomaly of the *Allen* case." (*United States* v. *Bailey* (5th Cir. 1972) 468 F.2d 652, 666.)

Nevertheless, the *Allen* charge won relatively quick adoption in some 10 states. (See Note, *An Argument for the Abandonment of the Allen Charge in California* (1975) 15 Santa Clara Law. 939, fn. 3; Annot., 100 A.L.R.2d 177-217.) California was not among the early enthusiasts. Undoubtedly the popularity of the instruction stemmed from its perceived efficiency as a means of "blasting" a verdict out of a deadlocked jury in a manner which had the imprimatur of the highest court in the land.[4] At the same time, trial judges were not averse to adding their own embellishments to the approved text, frequently in an apparent attempt to increase the intensity of the "blast." The practice arose of adding an observation, not included in the instruction originally approved in *Allen,* to the effect that "the case must at some time be decided" (see, e.g., *People* v. *Ozene* (1972) 27 Cal.App.3d 905, 911 [104 Cal.Rptr. 170]; *United States* v. *Brown* (7th Cir. 1969) 411 F.2d 930, 933; *Huffman* v. *United States* (5th Cir. 1962) 297 F.2d 754, 759 (conc. and dis. opn. of Brown, J.)) or that the jury had been "selected in the same manner and

---

[4]For a survey of the more draconian measures which have been thought useful in procuring verdicts, see the discussion in *United States* v. *Bailey* (5th Cir. 1972) *supra,* 468 F.2d 652, 665.

from the same source from which any future jury must be selected, and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial or more competent to decide it . . . ." (*Ozene, supra,* at p. 911 of 27 Cal.App.3d; see also Mathes, Jury Instructions and Forms for Federal Criminal Cases (1969) 27 F.R.D. 39, Inst. No. 8.19 at pp. 102-104.)

Thus it is somewhat imprecise to refer to a single *Allen* charge. Decades of judicial improvisation have produced a variety of permutations and amplifications of the original wording, some remarkably elaborate. (See, e.g., *Tomoya Kawakita* v. *United States* (9th Cir. 1951) 190 F.2d 506, 524-525, fn. 17; Mathes, *op. cit. supra,* 27 F.R.D. 39, 102.) Nevertheless, it is possible to isolate the two elements frequently found in such instructions—and found in the charge given in this case—which raise the gravest doubts as to their propriety.

The first and most questionable feature is the discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views. In the *Allen* opinion this concept is expressed in the following passage: "if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority." (164 U.S. at p. 501 [41 L.Ed. at p. 531].) The same language, with some elaboration and deference to female jurors, was used by the trial judge in the case at bar. A second controversial element in *Allen*-type instructions, not approved in *Allen* itself, is the direction given by the court below that "You should consider that the case must at some time be decided."

Neither of the foregoing phrases received judicial approval in California until 1958. In that year, the Court of Appeal considered a case in which the trial judge, after inadvertently learning that the jury stood 11 to 1 for conviction, delivered a conventionally embellished version of the *Allen* instruction. (*People* v. *Baumgartner* (1958) 166 Cal.App.2d 103 [332 P.2d 366].) The appellate court reversed the conviction on the ground that under the circumstances the charge was coercive of the holdout juror. Nevertheless, without citing *Allen* or any other authority, the court also declared in dictum that had the trial judge "not been informed to the knowledge of all as to the fact that the jury stood 11 to 1 for

conviction" the charge would have been proper, since it had been "worked out long ago as to form and ha[d] been frequently used." (*Id.* at p. 108.) On the basis of *Baumgartner,* Courts of Appeal also approved *Allen*-type charges in *People* v. *Ortega* (1969) 2 Cal.App.3d 884, 896 [83 Cal.Rptr. 260], *People* v. *Gibson* (1972) 23 Cal.App.3d 917, 921 [101 Cal.Rptr. 620], *People* v. *Guillen* (1974) 37 Cal.App.3d 976, 985 [113 Cal.Rptr. 43], and *People* v. *Terry* (1974) 38 Cal.App.3d 432, 448, footnote 2 [113 Cal.Rptr. 233]. *Allen* itself is first cited in support of the charge which bears its name in *People* v. *Ozene* (1972) *supra,* 27 Cal.App.3d 905, 910-914. However, no supplemental jury instruction containing either the admonition to minority jurors or the statement that "the case must at some time be decided" has ever been approved in a holding of this court.

In evaluating the charge we also consider its treatment in recent decisions of other jurisdictions. There we find that *Allen*-type instructions have been subjected to a withering barrage of attacks, largely on the grounds they are coercive or inaccurate.[5] Although no opinion of the United States Supreme Court has addressed a challenge to this charge since the original *Allen* case,[6] 3 federal circuits[7] and at least 22 states[8]

[5]The *Allen* charge has also been the subject of intense critical commentary. (See, e.g., Note, *An Argument for the Abandonment of the Allen Charge in California* (1975) 15 Santa Clara Law. 939; Note, *The Allen Charge: Recurring Problems and Recent Developments* (1972) 47 N.Y.U. L.Rev. 296; Note, *Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge* (1967) 53 Va.L.Rev. 123; Note, *Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge"* (1964) 31 U.Chi.L.Rev. 386.)

[6]But see *Lias* v. *United States* (1931) 284 U.S. 584 [76 L.Ed. 505, 52 S.Ct. 128] (per curiam); *Kawakita* v. *United States* (1952) 343 U.S. 717, 744 [96 L.Ed. 1249, 1268-1269, 72 S.Ct. 950]; *Johnson* v. *Louisiana* (1972) 406 U.S. 356, 362 [32 L.Ed.2d 152, 159, 92 S.Ct. 1620].

[7]These are the Third, Seventh, and District of Columbia Circuits. (See *United States* v. *Fioravanti* (3d Cir. 1969) 412 F.2d 407, cert. den. *sub nom. Panaccione* v. *United States* (1969) 396 U.S. 837 [24 L.Ed.2d 88, 90 S.Ct. 97]; *United States* v. *Brown* (7th Cir. 1969) 411 F.2d 930; *United States* v. *Thomas* (D.C.Cir. 1971) 449 F.2d 1177 [146 App.D.C. 101].)

[8]State court cases which have disapproved *Allen*-type instructions, in whole or in part, include: *Fields* v. *State* (Alaska 1971) 487 P.2d 831; *State* v. *Thomas* (1959) 86 Ariz. 161 [342 P.2d 197]; *Taylor* v. *People* (1971) 176 Colo. 316 [490 P.2d 292]; *Bryan* v. *State* (Fla.App. 1973) 280 So.2d 25; *State* v. *Brown* (1971) 94 Idaho 352 [487 P.2d 946]; *People* v. *Mills* (1971) 131 Ill.App.2d 693 [268 N.E.2d 571]; *State* v. *Nicholson* (La. 1975) 315 So.2d 639; *State* v. *White* (Me. 1972) 285 A.2d 832; *People* v. *Sullivan* (1974) 392 Mich. 324 [220 N.W.2d 441]; *State* v. *Martin* (1973) 297 Minn. 359 [211 N.W.2d 765]; *State* v. *Randall* (1960) 137 Mont. 534 [353 P.2d 1054, 100 A.L.R.2d 171]; *State* v. *Garza* (1970) 185 Neb. 445 [176 N.W.2d 664]; *Azbill* v. *State* (1972) 88 Nev. 240 [495 P.2d 1064]; *State* v. *Blake* (1973) 113 N.H. 115 [305 A.2d 300]; *State* v. *Minns* (1969) 80 N.M. 269 [454 P.2d 355]; *State* v. *Champagne* (N.D. 1972) 198 N.W.2d 218; *State* v. *Marsh* (1971) 260 Ore. 416 [490 P.2d 491], cert. den. *sub. nom. O'Dell* v. *Oregon* (1972) 406 U.S. 974 [32 L.Ed.2d

have disapproved the instruction. The American Bar Association has recommended abandonment of the charge.[9] Moreover, many decisions which tolerate continued use of the charge have done so grudgingly under compulsion of stare decisis (e.g., *U.S.* v. *Bailey* (5th Cir. 1972) *supra,* 468 F.2d 652, 669, affd. (1973) 480 F.2d 518), or have sought to place curbs on its use. These restrictions often take the form of limiting the charge to the original language approved in *Allen* (see, e.g., *United States* v. *Flannery* (1st Cir. 1971) 451 F.2d 880, 883; *United States* v. *Kenner* (2d Cir. 1965) 354 F.2d 780, 782-784; *United States* v. *Rogers* (4th Cir. 1961) 289 F.2d 433), or requiring "balancing" instructions (see, e.g., *Flannery, supra,* at p. 883; Note, *On Instructing Deadlocked Juries* (1968) 78 Yale L.J. 100, 106, fn. 26, and cases cited). In short, the indisputable modern trend is to abandon *Allen* (*U. S.* v. *Bailey* (5th Cir. 1972) *supra,* 468 F.2d 652, 668), and an examination of the impact of each of the crucial elements which may be found in *Allen*-type charges demonstrates the persuasive justification for that sentiment.

### The Admonition to Minority Jurors

One of the basic ingredients in our traditional concept of a fair trial is a circumscription on that which the trier of fact may consider in

---

674, 92 S.Ct. 2420]; *Commonwealth* v. *Spencer* (1971) 442 Pa. 328 [275 A.2d 299]; *State* v. *Patriarca* (1973) 112 R.I. 14 [308 A.2d 300]; *Kersey* v. *State* (1975) — Tenn. — [525 S.W.2d 139]; *Kelley* v. *State* (1971) 51 Wis.2d 641 [187 N.W.2d 810]; *Elmer* v. *State* (Wyo. 1969) 463 P.2d 14.

[9]In so recommending, the American Bar Association (ABA) promulgated the following standard:

"5.4 *Length of deliberations; deadlocked jury.*

"(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

"(i) that in order to return a verdict, each juror must agree thereto;

"(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

"(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

"(iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

"(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

"(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

"(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement." (ABA Project on Minimum Standards for Criminal Justice, Stds. Relating to Trial by Jury (Approved Draft 1968) std. 5.4.)

reaching a verdict. " 'The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court . . . .' " (*Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 351 [16 L.Ed.2d 600, 614, 86 S.Ct. 1507], quoting from *Patterson* v. *Colorado* (1907) 205 U.S. 454, 462 [51 L.Ed. 879, 881, 27 S.Ct. 556].) This rule applies no less to juries than to judges, and the decisions of both this court and the United States Supreme Court reflect the importance of restricting the foundation for the jury's decision to the evidence and arguments presented at trial. (See, e.g., *Sheppard* v. *Maxwell* (1966) *supra,* 384 U.S. 333; *Irvin* v. *Dowd* (1961) 366 U.S. 717 [6 L.Ed.2d 751, 81 S.Ct. 1639]; *Turner* v. *Louisiana* (1965) 379 U.S. 466 [13 L.Ed.2d 424, 85 S.Ct. 546]; and *Maine* v. *Superior Court* (1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372].) ■ An equally significant principle relates to the right of both the People and the defendant to the individual judgment of each juror on the issue of guilt. (*People* v. *Dole* (1898) 122 Cal. 486, 495 [55 P. 581]; *People* v. *Wong Loung* (1911) 159 Cal. 520, 535 [114 P. 829].)

Yet in instructing that "a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression on the minds of so many men or women equally honest, equally intelligent with himself or herself," the trial judge pointedly directs the jurors to include an extraneous factor in their deliberations, i.e., the position of the majority of jurors at the moment. The one or more "holdout" jurors are told that in reaching their independent conclusions as to whether or not a reasonable doubt of the defendant's guilt exists, they are to weigh not only the arguments and evidence but also their own status as dissenters—a consideration both rationally and legally irrelevant to the issue of guilt.[10] They are thus deflected from their proper role as triers of fact, as effectively as if they had been instructed to consider their doubts as to guilt in light of their own prejudices or desire to go home.

Moreover, the extraneous majoritarian appeal contained in the *Allen* instruction interferes with the jury's task in a way which threatens the

[10]The instruction does not escape this condemnation because it may be interpreted as requiring dissenters to merely "reexamine" their views rather than to directly include majoritarian factors in the primary calculus of guilt. At best this reading strains the language of the charge. More significantly, minority jurors have no greater duty to "reexamine" their views than do majority jurors. Finally, we should not hesitate to condemn an instruction which carries a strong implication that jurors should consider the preponderance of votes in forming their views simply because the charge subtly avoids an explicit statement of that proposition.

defendant's right under the California Constitution to have his guilt or innocence determined by the unanimous verdict of a jury of 12 persons. (Cal. Const., art. I, § 16; *People* v. *Collins* (1976) 17 Cal.3d 687, 692 [131 Cal.Rptr. 782, 552 P.2d 742]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 350 [121 Cal.Rptr. 509, 535 P.2d 373].) "Unanimity obviously requires that each juror must vote for and acquiesce in the verdict. Acquiescence simply because the verdict has been reached by the majority is not an independent judgment, and if permitted, would undermine the right to a unanimous verdict." (*People* v. *Superior Court (Thomas)* (1967) 67 Cal.2d 929, 932 [64 Cal.Rptr. 327, 434 P.2d 623, 25 A.L.R.3d 1143].) The open encouragement given by the charge to such acquiescence is manifestly incompatible with the requirement of independently achieved jury unanimity.

It follows that even if it were possible to demonstrate that *Allen's* admonition to dissenters were without appreciable effect on a jury, it would nevertheless be objectionable as a judicial attempt to inject illegitimate considerations into the jury debates as an appeal to dissenting jurors to abandon their own independent judgment of the case against the accused.

Beyond doubt, however, the instruction has a devastating effect—otherwise it would not have been considered efficacious enough to defend through the years despite its obvious flaws. The pragmatic force of the charge has also encouraged both its defenders and its opponents to phrase the problem of its use in terms of whether or not it "coerces" juries to reach verdicts. (See, e.g., *People* v. *Ozene* (1972) *supra,* 27 Cal.App.3d 905, 910-914; Note, *On Instructing Deadlocked Juries* (1968) 78 Yale L.J. 100, 105.)

However, if this "coercion" test is characterized as a quasi-factual inquiry into whether a juror did or did not surrender his true convictions, insuperable difficulties are encountered. Courts are generally unable to recreate effectively the events, subjective and objective, occurring during jurors' deliberations in order to evaluate the actual effects of an instruction.[11] Nor is it clear that even if judges were given such

---

[11]The limited admissibility of juror testimony under *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132], and Evidence Code section 1150, clearly does not enable an effective inquiry of this type. Under section 1150, subdivision (a), "any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is admissible to show the effect of such statement, conduct, condition or event upon a juror either in*

retrospective omniscience, they could agree on the point at which a juror was "coerced" into changing his vote. Given the difficulties ordinarily facing such a determination, the duty of the courts to insure the fairness of criminal trials requires a broader inquiry, i.e., whether the instructions tend to impose such pressure on jurors to reach a verdict that we are uncertain of the accuracy and integrity of the jury's stated conclusion. This determination of whether the instructions "operate to displace the independent judgment of the jury in favor of considerations of compromise and expediency" (*People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353]) is perhaps best characterized as requiring a generalized assessment of the potential effect of a given instruction on the fact finding process, rather than as an attempted inquiry into the actual volitional quality of a particular jury verdict. Defendant's claim that the *Allen* charge is inherently coercive is thus more aptly phrased as a contention that the instruction simply exerts "undue pressure upon the jury to reach a verdict." (*Id.* at p. 817; see also *United States* v. *Seawell* (9th Cir. 1977) 550 F.2d 1159, 1163.)

In addition to invoking impermissible considerations, the admonition to minority jurors given herein constitutes just such excessive pressure on the dissenting jurors to acquiesce in a verdict. The dissenters, struggling to maintain their position in a protracted debate in the jury room, are led into the courtroom and, before their peers, specifically requested by the judge to reconsider their position. No similar request is made of the majority.[12] It matters little that the judge does not know the identity of the particular dissenters; their fellow jurors know, and the danger immediately arises that "the *Allen* charge can compound the inevitable pressure to agree felt by minority jurors." (*People* v. *Smith* (1974) 38 Cal.App.3d 401, 406 [113 Cal.Rptr. 409].) The charge " 'places the sanction of the court behind the views of the majority, whatever they may be, and tempts the minority juror to relinquish his position simply because he has been the subject of a particular instruction.' " (*U. S.* v. *Bailey, supra,* 468 F.2d at p. 662, quoting from Note, *Due Process,*

*influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."* (Italics added.) "Coercion," as used in this context, refers primarily to a process within the mind of the minority juror and responsive to statements made by the judge in open court. Thus, the evidence of "objective facts" admissible under section 1150 and *Hutchinson (supra,* at p. 351) will not resolve the issue. (See also ABA Project on Minimum Standards for Criminal Justice, Stds. Relating to Trial by Jury (Approved Draft 1968) *supra,* commentary to std. 5.4(b) at p. 153.)

[12]Since recognition of the existence of a majority or minority faction on the jury is irrelevant to the issue of guilt, such reference is erroneous, even if contained in an arguably noncoercive, "balanced" *Allen* charge which explicitly admonishes the majority as well as the minority to reconsider their views.

*Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge* (1967) 53 Va.L.Rev. 123, 129-130.) As we noted in *Carter*, reversible error may be found in excessive pressure upon the jury "to reach *a* verdict, whatever its nature, rather than no verdict at all." (68 Cal.2d at p. 817.)[13]

Neither is the overbearing character of the charge altered by the judge's ignorance of whether the majority of the jury favors conviction or acquittal. The charge may distort the jury debate in a direction favorable or unfavorable to the defendant—but it distorts it nonetheless.[14] Nor need we speculate that in the majority of cases the giving of an *Allen* instruction will aid the prosecution rather than the defense: an even distribution of risk between prosecution and defense over a multitude of cases is not the measure of justice. Our jury system aspires to produce fair and accurate factual determinations in each case. An improper instruction should not be tolerated simply because statistically it may help defendants as much as prosecutors. Whichever adversary it favors, in urging minority jurors to reconsider their votes the *Allen* charge places excessive and illegitimate pressures on the deliberating jury. For this reason the giving of the charge is error.

### *"The Case Must at Some Time Be Decided"*

The portion of the instruction beginning with the phrase, "You should consider that the case must at some time be decided," with its attendant implication that a mistrial will inevitably result in a retrial, presents a somewhat different problem from the admonition to minority jurors. While the latter language was included in the original instruction approved in *Allen*, the former, as previously noted, was a judicial addition to the *Allen* text. On the other hand, dictum in *People* v. *Carter* (1968) *supra,* 68 Cal.2d 810, 815-816, does suggest the possibility of "reminding [the jury] that in the event of a mistrial the case will have to be retried." (See also *People* v. *Miles* (1904) 143 Cal. 636, 639 [77 P. 666]; cf. *People* v. *Burton* (1961) 55 Cal.2d 328, 356 [11 Cal.Rptr. 65, 359 P.2d 433]; *People* v. *Crowley* (1950) 101 Cal.App.2d 71, 74 [224 P.2d 748].)

---

[13]The People contend that *Carter* "implicitly approved" the entire *Allen* charge. However, language endorsing the admonition to minority jurors to reconsider their views is conspicuously absent from the *Carter* opinion.

[14]Of course, when an *Allen* charge provokes a verdict of not guilty, the finality of that judgment precludes review of the instruction on appeal. Since appellate courts can hear only cases involving conviction, it is impossible to estimate the percentage of cases in which an *Allen* instruction is followed by a verdict of acquittal.

The language regarding the effect of a mistrial is vulnerable to a different, more exoteric objection: such statements are legally inaccurate. It is simply not true that a criminal case "must at some time be decided."[15] ■ The possibility of a hung jury is an inevitable by-product of our unanimous verdict requirement. Confronted with a mistrial, the People retain the authority to request dismissal of the action. (Pen. Code, § 1385.) Moreover, this option is frequently exercised, as the criminal bar knows, when the prosecution concludes that its inability to obtain a conviction stemmed from deficiencies in its case. Thus the inconclusive judgment of a hung jury may well stand as the final word on the issue of a defendant's guilt. Because an instruction which implies that a hung jury will assuredly result in a retrial misstates the law, the court erred in giving that portion of the charge stating "the case must at some time be decided." (Cf. *People* v. *Morse* (1964) 60 Cal.2d 631, 650 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.2d 810].)

■ To summarize our conclusions thus far, both controversial features of the *Allen*-type charge discussed herein inject extraneous and improper considerations into the jury's debates. We therefore hold it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried.[16] We adopt the foregoing as a judicially declared rule of criminal procedure. (Cf. *People* v. *Rhodes* (1974) 12 Cal.3d 180, 185 [115 Cal.Rptr. 235, 524 P.2d 363]; *People* v. *Vickers* (1972) 8 Cal.3d 451, 461 [105 Cal.Rptr. 305, 503 P.2d 1313]; *People* v. *Cahan* (1955) 44 Cal.2d 434, 442 [282 P.2d 905, 50 A.L.R.2d 513].)[17] Consequently we need not reach defendant's contention that the reading of the *Allen*-type charge violated his due process rights to a fair trial.

[15]In the context in which the charge is delivered, "decided" clearly refers to a dispositive determination of guilt by a trier of fact. Nor is the misleading implication of the sentence dissipated when it is ambiguously phrased, as in an alternate version, "the case must at some time be disposed of."

[16]A third common feature of *Allen*-type instructions is a reference to the expense and inconvenience of a retrial. While such language was absent from the charge in this case, it is equally irrelevant to the issue of defendant's guilt or innocence, and hence similarly impermissible.

[17]This conclusion also has the beneficial effect of removing a fertile source of criminal appeals. Were the giving of an *Allen*-type charge potentially proper, the appellate courts of this state would be required to sift the facts and circumstances of each case in which the charge was delivered to determine whether the charge placed undue pressure on the jury to agree. (See, e.g., *People* v. *Baumgartner* (1958) *supra*, 166 Cal.App.2d 103, 107.)

*Retroactivity*

■ In determining the appropriate application of this holding, we begin with the three relevant considerations prescribed in previous cases: " '(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.' " (*People* v. *Hitch* (1974) 12 Cal.3d 641, 654 [117 Cal.Rptr. 9, 527 P.2d 361], quoting from *Stovall* v. *Denno* (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967].)[18] ■ Undoubtedly our disapproval of *Allen*-type charges is not directed at the prophylactic prevention of police misconduct (see *In re Lopez* (1965) 62 Cal.2d 368, 377-379 [42 Cal.Rptr. 188, 398 P.2d 380]; *People* v. *Rollins* (1967) 65 Cal.2d 681, 685-691 [56 Cal.Rptr. 293, 423 P.2d 221]; see also *In re Harris* (1961) 56 Cal.2d 879, 880 [16 Cal.Rptr. 889, 366 P.2d 305] (conc. opn. of Traynor, J.)); rather it is aimed at judicial error which significantly infects the fact-finding process at trial. (See *Stovall, supra,* at p. 298 [18 L.Ed.2d at p. 1204].) Given this critical purpose, neither judicial reliance on previous appellate endorsements of the charge in this state nor any effects on the administration of justice require us to deny the benefit of this rule to cases now pending on appeal. (*Stovall, supra,* at pp. 300-301 [18 L.Ed.2d at pp. 1205-1206]; *People* v. *Charles* (1967) 66 Cal.2d 330, 333-337 [57 Cal.Rptr. 745, 425 P.2d 545], and cases there cited.) The latter consideration might be expected to weigh heavily against reliance on today's ruling for the purpose of reopening convictions now final. (See *Lopez, supra,* at p. 381; *In re Gaines* (1965) 63 Cal.2d 234, 240 [45 Cal.Rptr. 865, 404 P.2d 473]; *Rollins, supra,* at p. 685.) However, because the record before us provides little basis for assessing the impact of such retroactive application, we do not determine whether or not our holding should be cognizable on collateral attack. We decide only that the rule we here announce shall apply to the instant matter and to all cases not yet final as of the date of this decision.

---

Eighteen years ago, consideration of the amount of judicial energy spent on such inquiries prompted the Arizona Supreme Court to abandon the charge. (*State* v. *Thomas* (1959) 86 Ariz. 161 [342 P.2d 197].) Other courts which have banned *Allen* have also done so in the name of appellate economy. (See *United States* v. *Brown, supra,* 411 F.2d 930; *United States* v. *Fioravanti, supra,* 412 F.2d 407; *United States* v. *Thomas, supra,* 449 F.2d 1177.)

[18]These factors have been applied to determine the appropriate scope of judicially declared rules which are not necessarily constitutionally required. (See, e.g., *In re Yurko* (1974) 10 Cal.3d 857, 865 [112 Cal.Rptr. 513, 519 P.2d 561]; *Halliday* v. *United States* (1969) 394 U.S. 831, 832 [23 L.Ed.2d 16, 19-20, 89 S.Ct. 1498].)

### Prejudicial Effect

Because we hold it is error to read a charge containing either of the questionable elements discussed above, such instructions presumably will no longer be used in this state. However, in order to resolve appeals from convictions which come within the limited rule of retroactivity announced above—as well as to decide the present case—it will be necessary to determine the prejudicial effect of those errors. In considering this problem we distinguish the two erroneous aspects of the charge delivered by the judge below.

As observed above, the ability of courts to gauge the precise effect on a jury of *Allen*-type instructions is limited, both by the traditional secrecy of jury deliberations and by the inherent difficulties of estimating the impact of only one factor injected into the subjective processes of each juror. Many of these problems confront attempts to determine the effect of any error, but the difficulties are multiplied in the situation of the discriminatory admonition to dissenters delivered as a supplementary instruction to a divided jury. For example, when inadmissible evidence has been introduced in a criminal trial, the court reviewing a resulting conviction may conclude, after examining all the evidence, that the information erroneously admitted was "surplus" or otherwise nonprejudicial. (See, e.g., *People* v. *Cavanaugh* (1955) 44 Cal.2d 252, 268 [282 P.2d 53].) However, such evidentiary review is less apposite when, prior to the infusion of error, the jury by hypothesis themselves canvassed the evidence and arguments, and were unable to agree as to their import. (See Note, *op. cit. supra,* 47 N.Y.U.L.Rev. 296, 308-309.) Moreover, the attack on dissenters does more than simply present another isolable factor for the jury's consideration—it distorts the very process by which all the evidence is weighed. An appellate court therefore may not assume that the verdict of the jury represents an untainted evaluation of whatever evidence was before them.

The possibility of prejudicial effect, as well as the difficulty of discovering such effect, is magnified by the nature and timing of an admonition to minority jurors when it is used, as is typically the case, to undermine jury division. The instruction skews the deliberative process in a particular direction—toward the result favored by the majority. More significantly, this error is introduced at a crucial stage when the jury looks to the bench for advice on how to solve their dilemma. At that point, all the evidence and arguments already presented to the jury—even if they may later seem to a reviewing court to convincingly show the

defendant's guilt—have failed to produce a verdict. Yet, with defendant's fate poised in the balance, the trial judge then tips the scales by use of an erroneous device. It is hard to conceive of circumstances in which error is more capable of producing prejudicial consequences.

■ In sum, when the erroneous admonition to minority jurors is given or repeated to a criminal jury which have indicated that they are divided, it is difficult if not impossible to ascertain if in fact prejudice occurred; yet it is very likely that it did. We conclude that a conviction following such a charge given in those circumstances is a "miscarriage of justice" within the meaning of article VI, section 13, of the California Constitution, and the judgment must be reversed. (See also Code Civ. Proc., § 475; *People* v. *Lyons* (1956) 47 Cal.2d 311, 324 [303 P.2d 329].)[19] The rule requires reversal in the instant case.

■ An erroneous instruction to the effect that "the case must at some time be decided" presents some, but not all, of the foregoing considerations. When the statement is part of a supplementary charge to a divided jury, there is a significant danger that the verdict will be influenced by a false belief that a mistrial will necessarily result in a retrial; on the other hand, the statement does not threaten to distort the process of jury decision-making to the same degree as the admonition to dissenters. Accordingly, a per se rule of reversal is not required when only this erroneous statement is included in otherwise correct instructions, even if given to a deadlocked jury. In such cases a miscarriage of justice will be avoided if the reviewing court makes a further examination of all the circumstances under which the charge was given to determine whether it was reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) ■ In so doing, however, the court should recognize that the more the erroneous statement appears to have been a significant influence exerted on a jury after a division of juror opinion had crystallized, the less relevant is the

[19]Similar considerations recently led the federal Court of Appeals for the Ninth Circuit to declare a per se rule of reversal in cases in which a judge repeats an *Allen* charge "after a jury has reported itself deadlocked and has not itself requested a repetition of the instruction." (*United States* v. *Seawell* (1977) *supra*, 550 F.2d 1159 1163.) The court conceded that "A per se rule, such as the one we have adopted here, always poses the risk that it may sweep within its embrace cases which do not warrant its protection." (Fn. 8 at p. 1163.) However, after noting that defendants would otherwise "face insurmountable difficulties in attempting to show prejudice," the majority concluded that the " 'cost' of adopting a per se rule is outweighed by the importance of defendant's right to an impartial jury trial and the insurmountable problems of proof and appellate review that a less definite rule would occasion." (*Ibid.*)

court's own perception of the weight of the evidence presented to the jury before the impasse.[20]

## Appropriate Instructions

■ For the guidance of the trial bench, we note that none of the errors enumerated herein is contained in CALJIC No. 17.40 (3d ed. 1970), and we commend its continued use. The sample instruction endorsed by the American Bar Association also eliminates the objectionable aspects of the charge given in this case, and advises the jury of their proper role in a manner which may assist them in their deliberations.[21]

## Summary

■ The *Allen* charge, to the extent it still survives, has been preserved because it is deemed to be an effective device for producing verdicts from otherwise deadlocked juries. However, it achieves such efficacy as it may have through a subtle mixture of inaccuracy and impropriety, in a manner which can dramatically distort the fact-finding function of the jury in a criminal case.[22] Ultimately, even the saving of judicial resources, which has been the main justification for its continued existence, is outweighed by the burden the charge imposes on the appellate courts. To borrow the words uttered for a defendant who has

[20]For example, when the statement is the central feature of instructions given to a deadlocked jury, it is more likely to have tainted their subsequent verdict than when the panel has evinced no division and the statement merely accompanies a requested rereading of portions of the testimony or previous instructions. In the former case, the standard of reversible error presumably would be met, as there would be little to indicate that the heightened potential for prejudice had not been realized.

[21]The instruction reads in relevant part:

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

"It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict." (ABA Project on Minimum Standards for Criminal Justice, Stds. Relating to Trial by Jury (Approved Draft 1968) *supra,* commentary to std. 5.4(a), at p. 146, quoting from Mathes, *op. cit. supra,* 27 F.R.D. 39, 97-98.)

This instruction, like CALJIC No. 17.40, may be included in the initial instructions given to the jury before they begin deliberations, or, where appropriate, delivered as a supplemental charge.

[22]Since the use of *Allen*-type instructions in civil cases may be subject to different considerations, we do not decide whether such use is also error.

long since lost his appeal, in criminal trials an *Allen*-type instruction "should never again be read in a California courtroom." (*People* v. *Smith, supra,* 38 Cal.App.3d 401, 406.)

### *Remaining Issues*

 Two further issues are raised by defendant on this appeal. First, he argues it was error for the trial court to admit into evidence a revolver found at his apartment. Second, he contends he was denied effective assistance of counsel when the attorney with whom he consulted after his arrest allowed the police to procure the weapon. Because the validity of any retrial of this case may depend on the correct resolution of these issues and they are properly before us, we decide them here. (Code Civ. Proc., § 43.)

Defendant contends the gun was the "fruit" of an interrogation conducted in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and was therefore inadmissible. (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 486 [9 L.Ed.2d 441, 454, 83 S.Ct. 407]; *People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].) The interview in question occurred immediately after defendant presented himself at the police station on the day of the crime. A tape of the conversation revealed that he declined to waive his right to remain silent and expressed a desire not to talk with police officers at that time. The trial judge partially granted defendant's motion to suppress statements made after the interrogating officer, Detective Kannisto, prolonged the interview, and the People do not contest this ruling. (*Miranda, supra,* at pp. 473-474 [16 L.Ed.2d at pp. 722-724]; *Keithley, supra,* at p. 410.)[23] After the initial interrogation, defendant was permitted to meet with his

---

[23]The trial court did admit two statements made by defendant after he had refused to discuss the case. These were answers that defendant interjected in response to questions directed by Kannisto to his partner, Sergeant Fusselman. Kannisto testified as follows: "I asked my partner, 'What type of gun was that, do you know?'

"Q. [by deputy district attorney]. And, what if anything did he reply?

"A. My partner didn't say anything. The Defendant, who was seated to my right, replied 'Thirty-Eight Special.'

"Q. Did you make any further inquiries then?

"A. I then replied, 'Smith & Wesson?'

"The Defendant then replied, 'Thirty-Eight Special, registered to me,' I believe.

"Q. Do you recall—referring to your notes, if necessary—whether the specific type of gun was mentioned by the Defendant?

"A. I believe he said, 'Charter Arms, registered to me.' "

Kannisto admitted that his partner may have had in his possession a copy of the registration card for defendant's gun, and that defendant could have been referring to

parents in private. Upon emerging from the meeting, he agreed to show Kannisto the location of his revolver. Defendant also met briefly with an attorney, who, according to Kannisto, then told the police that it was "okay to search for the gun." The police drove defendant to his apartment, where he pointed out the gun in a cabinet.

Defendant relies on our decision in *Keithley.* There the defendant made a highly incriminating admission during an unlawful interrogation, and we reasoned that his subsequent consent to a search "may well have been influenced by knowledge he had already admitted involvement in the crime." (*Id.* at p. 411.) In this case, however, the unlawfully obtained statements were ambiguous, if not completely benign.[24] Moreover, in *Keithley* the police told the defendant, during the unlawful interview, that they intended to obtain a search warrant—after which the defendant promptly agreed to the search. Although Kannisto continued subtly urging defendant to discuss the case after the latter had refused a *Miranda* waiver, the consent to search came only after an intervening discussion between defendant and his parents. Thus, the record presents no basis for holding that defendant's consent was the result of exploitation of the earlier interrogation so as to require application of the constitutional exclusionary policies of *Wong Sun* and *Keithley.*

 We further reject defendant's claim that he was denied effective assistance of counsel in violation of his Sixth Amendment rights. It is defendant's burden to show counsel's incompetence. (*People* v. *Stanworth* (1974) 11 Cal.3d 588, 613 [114 Cal.Rptr. 250, 522 P.2d 1058]; *People* v. *Jenkins* (1975) 13 Cal.3d 749, 753 [119 Cal.Rptr. 705, 532 P.2d 857].) "The proof of this inadequacy or ineffectiveness must be a demonstrable reality and not a speculative matter." (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820].) Here, all the evidence discloses is that defendant's attorney consented to the police search for the gun—and presumably advised defendant to so consent—after meeting for approximately 10 minutes with his client. These bare facts do not support a conclusion that

---

the weapon noted on the card rather than the gun used in the slaying.

Defendant did not testify that he thought the questions were directed to him, and he does not attack on appeal the admission of his responses.

[24] The only potentially significant statements suppressed at trial were defendant's vague remarks that "I never . . . disliked the man or anything" and "I don't even remember what brought it on." Nor can defendant's consent reasonably be termed a reaction to his having interjected answers to Kannisto's queries of Sergeant Fusselman. (See fn. 23, *ante.*) Even were we to consider, in this context, an attack on the admissibility of those admissions, their prejudicial effect is questionable.

counsel's advice was incompetent. (Cf. *Stanworth, supra,* 11 Cal.3d at p. 608.) The revolver was registered to defendant, and his attorney may well have recognized that the police could obtain a warrant to search for it if necessary.

The judgment is reversed.

Tobriner, Acting C. J., Richardson, J., Wright, J.,* Sullivan, J.,† and Taylor, J.,‡ concurred.

**CLARK, J.,** Dissenting.—"Once a cause has been submitted to the jury, and absent a discharge by consent, the court bears the statutory responsibility of assuring that a verdict is rendered 'unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' (Pen. Code, § 1140.) [¶] The discharge of this responsibility necessarily requires that the court, in cases where the jury has been unable to reach agreement, make the indicated determination of 'reasonable probability' and, in cases where in accordance with sound legal discretion [citations omitted] it is determined that such a probability exists, that it take appropriate action to encourage agreement." (*People* v. *Carter* (1968) 68 Cal.2d 810, 815 [69 Cal.Rptr. 297, 442 P.2d 353].)

The "*Allen* instruction" is an "appropriate action to encourage agreement." But the majority opinion attacks two aspects of the instruction.

First, the majority find fault with the clause "the case must at some time be decided." However, this court understandably approved that statement in *People* v. *Carter, supra,* 68 Cal.2d 810. "[I]f the court determines that a reasonable probability of agreement does exist, it may, generally speaking, undertake certain measures calculated to encourage agreement. These include impressing the jury with the solemnity and importance of its task and reminding it that in the event of a mistrial the case will have to be retried, with attendant expenditure of money and time, and decided upon similar if not identical evidence by a jury of

*Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

‡Assigned by the Chairman of the Judicial Council.

persons having qualifications equal to those of the present jury." (*Id.* at pp. 815-816.)

Next, the majority attack the *Allen* instruction as introducing an "extraneous factor" into the jury's deliberations, "deflect[ing them] from their proper role as triers of fact," insofar as it states that "a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression on the minds of so many men or women equally honest, equally intelligent with himself or herself." But the attack fails. To suggest that someone reexamine his view because the majority of those called upon to decide a question have reached another conclusion hardly introduces an "irrational" or "irrelevant" consideration. And it is certainly not akin to instructing him to decide the question from his "prejudices or desire to go home." For example, it is common for one judge of this court to invite another to reexamine his position upon a showing that a majority of jurisdictions considering an issue have taken the opposite position. Indeed, in this very case the majority opinion, manifesting uneasiness in adopting the view held by only a minority of jurisdictions on the *Allen* question, cites the decisions of three federal circuits and "at least 22 states" as evidence that its position represents the "modern trend." The appeal to be "modern" is, of course, a separate consideration, one more appropriate to the fashion industry than to the law. On the other hand, the fact that a significant number of jurisdictions disapprove of a practice is a valid reason for reconsidering it.' But, as the *Allen* instruction emphasizes, one's decision must ultimately be one's own.

Having reconsidered the *Allen* instruction because a majority of my colleagues appear to disapprove of it, I still agree with Chief Justice (then Circuit Judge) Burger that "the *Allen* charge is a carefully balanced method of reminding jurors of their elementary obligations, which they can lose sight of during protracted deliberations. It is perfectly valid to remind them that they should give some thought to the views of others and should reconsider their position in light of those views. The charge as given here did not *require* the jury to reach a verdict but only reminded them of their duty to attempt an accommodation. While it suggests to the minority that they reconsider their position in light of a majority having a different view, it reminds them that they should not acquiesce in a verdict which does not represent their own convictions."

(*Fulwood* v. *United States* (D.C.Cir. 1966) 369 F.2d 960, 962 [125 App.D.C. 183], cert. den., 387 U.S. 934 [18 L.Ed.2d 996, 87 S.Ct. 2058].)

The judgment should be affirmed.

Respondent's petition for a rehearing was denied October 13, 1977. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.