Filed 7/29/15  P. v. Earles CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049633 |
| v. | (Super. Ct. No. 10WF0289) |
| BUSTER LEE EARLES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Buster Lee Earles guilty of five counts of lewd acts upon a child under 14 in violation of Penal Code section 288, subdivision (a). Counts one through three charged lewd acts on Jane Doe No. 1 occurring between November 7, 1999 and November 6, 2007. Count four charged a lewd act on Jane Doe No. 2 occurring between March 22, 2004 and March 21, 2005. Count five charged a lewd act on Jane Doe No. 3 occurring between March 1, 2006 and March 31, 2006. The jury found the allegation defendant committed the crime of lewd act upon a child under 14 against more than one victim within the meaning of Penal Code section 667.61, subdivision (c), true. The jury also found the allegation defendant committed the crime of substantial sexual conduct within the meaning of Penal Code section 1203.066, subdivision (a)(8), true. The court sentenced defendant to consecutive 45-year-to-life terms for each of the five counts, and consecutive five-year terms on all five counts pursuant to Penal Code section 667, subdivision (a)(1). The total term imposed was 250 years-to-life in state prison.

Defendant contends the trial court violated his right to a unanimous verdict when it read CALCRIM No. 3551 to the jury after the foreperson sent a note to the court indicating the jury was at an impasse with regard to one count. Finding no error, we affirm.

I

FACTS

Jane Doe No. 1

Jane Doe No. 1 was born in 1993. In late 1998 or early 1999 she moved into a unit in a mobilehome park with her mother, P.L. When she was approximately six years old, defendant began dating P.L. Around Thanksgiving of 2000 defendant moved in with P.L. and Jane Doe No.1 and the three resided together until 2010. During this period they lived in a total of three separate residences. In 2006, they moved to a second unit across the mobilehome park. They lived in the second unit for approximately two years before they moved to a townhome in Orange County. They lived in the townhome

for about a year and a half before P.L. found out about the sexual incidents between defendant and Jane Doe No. 1.

The first incident occurred a few months after defendant moved in with P.L. and Jane Doe No. 1, while defendant and Jane Doe No. 1 were watching television in the living room and P.L. was sleeping in her bedroom. Jane Doe No. 1 was six or seven years old. Defendant approached Jane Doe No. 1 while she was sitting either on the couch or the floor in the living room, opened his pants, and exposed his penis to her. He asked her to touch his penis, grabbed her hand and guided it to his penis. He then told her something to the effect of "don't tell your mom." Jane Doe No. 1 said after that first incident defendant either went to sleep or continued watching television. Jane Doe No.1 testified she could not remember if defendant had otherwise touched her in a sexual way during that first incident. During the police investigation when Jane Doe No. 1 was 16 years old, she told police defendant placed his hand in her pants and rubbed her vaginal area. At the time of trial, after her memory was refreshed with a writing, Jane Doe No. 1 remembered defendant touched her vaginal area during this first incident.

Jane Doe No.1 said she could not remember the second time she was touched because "they've all kind of just blurred together." She testified defendant continued touching her at least every month after the first incident until she was 15 or 16 years old. Jane Doe No. 1 recalled that these incidents consisted of defendant masturbating, touching her vaginal area and breasts, oral copulation, having her touch his penis, or having her orally copulate his penis. During the incidents of masturbation or oral copulation, Jane Doe No.1 recalled defendant would instruct her with directions such as—faster, harder, or squeeze. She testified "a lot of times" while she was sleeping in her bed at night, defendant would come into her room, expose his penis and "stick it in my face." She described incidents that occurred in the mother's bedroom, in the living room and in her bedroom. They sometimes happened while defendant's children were in the home, while Jane Doe No. 1's mother was either asleep in her bedroom or at work.

3

In addition, Jane Doe No. 1 recalled two instances when she was coming out of the shower, and discovered defendant sticking a mirror under the bathroom door. On both occasions she opened the door and found defendant standing there.

Jane Doe No. 1 did not tell her mother about the incidents until her mother confronted her in 2010. She explained she was scared of what would happen "To everyone. To the family and to myself." P.L. said she confronted Jane Doe No. 1 after finding an e-mail on Jane Doe No.1's phone, which indicated she had been touched by defendant. P.L. called the police. The two were interviewed at their home in February 2010. After the interview, the police had P.L. make a recorded phone call to defendant. The recorded phone call was played for the jury. During the phone call P.L. asked defendant what happened with Jane Doe No. 1. At first defendant would not answer her inquiry, but later said "I put her hand on my privates" and "I'm screwed up . . . I need help too." Defendant also admitted to sticking a mirror underneath the bathroom door. At the conclusion of the conversation, P.L. told him that she did not wish to see him again.

Jane Doe No. 2

Jane Doe No. 2 was born in 1995. At the age of nine, Jane Doe No. 2 lived in a unit in the mobilehome park. This unit was approximately three doors down from the first unit where defendant resided with Jane Doe No. 1 and P.L. She lived in this unit for about two years with her mother, J.K., her stepfather, and her sister, Jane Doe No. 3. Later, she lived with her grandmother in Riverside, during which time she would visit her mother at the mobilehome park on the weekends.

The incident with defendant occurred one day while nine-year-old Jane Doe No. 2 was visiting Jane Doe No. 1's first unit. She was watching television in the living room while Jane Doe No.1 and A.W. went outside either to play or to get something from the shed. She got up to go to the bathroom and noticed that defendant was following her. She described, "his room was right next to it so I thought he was just going in his room."

4

Defendant followed her into the bathroom and closed the door behind him. Jane Doe No. 2 looked at him confused. He stood in front of the doorway, pulled down his pants, and exposed his penis. Defendant grabbed her hand, put it on his penis, and tried to move her hand up and down. This only lasted a few seconds when she pulled her hand away. He then unbuttoned her pants and stuck his hand in her pants and underwear. Jane Doe No. 2 recalled defendant moved his finger into her vagina; she got scared, pulled away, and buckled her pants as she exited the bathroom. She also recalled defendant told her something along the lines of "just let me do it." Jane Doe No. 2 testified she went outside to find Jane Doe No. 1 and A.W. She recalled she told A.W. what happened later that day or the next, but did not tell Jane Doe No. 1.

A.W. had been friends with Jane Doe No. 2 for about six months to a year prior to the incident. A.W. testified that at some point while she, Jane Doe No. 1, Jane Doe No. 2, and defendant were watching television—she and Jane Doe No. 1 left the house to go to the shed. They were outside for three to five minutes before she returned to the living room alone. A.W. recalled she was in the living room for approximately two minutes before Jane Doe No. 2 returned. She testified Jane Doe No. 2 "looked a little frightened" and "distant." A.W. said two to three days after the incident occurred, Jane Doe No. 2 indicated defendant had followed her into the bathroom and had touched her.

Jane Doe No. 2 testified she did not tell her mother what happened until a few years later when she was either 12 or 13 years old. She explained, "I didn't want to think about it myself. I wanted to forget about it instead of saying something." She decided to tell her mother when she overheard her mother talking to their neighbor, about how Jane Doe No. 3 had been touched by defendant. After she told her mother what happened; her mother got very upset and took her to the police station to file a report. She filed a report with the police on November 2, 2008.

5

Jane Doe No. 2 testified she did not know Jane Doe No. 3 had been touched until she overheard her mother's conversation. She also said she remembered Jane Doe No. 3 going to a meeting with the child abuse services team (C.A.S.T.) to be interviewed and believed they both talked to the police on the same day.

Jane Doe No. 3

Jane Doe No. 3 was born in 2000. When she was around five or six years old, she lived in a mobilehome park in a unit with her mother, J.K., her stepfather, and her sister, Jane Doe No. 2.

J.K. testified one Saturday in March 2006 she left Jane Doe No. 3 at defendant's home while she went to the hospital. Jane Doe No. 3 recalled she was left alone with a male neighbor but could not recall his name or what he looked like. She was playing with dolls in Jane Doe No. 1's room when the male neighbor approached her. She remembered the male neighbor asking her, "Do you want to touch Mr. Weenie? Do you want to meet Mr. Weenie?" After replying "yes", the male neighbor exposed his penis. Jane Doe No. 3 said the male neighbor "made me put my mouth around Mr. Weenie." She could not remember how long "Mr. Weenie" was in her mouth, but testified the male neighbor did not touch her anywhere other than her mouth. Afterwards, she went to the bathroom and her mother picked her up later that day. Jane Doe No. 3 testified she told her mother what happened later that day.

J.K. testified when she picked her up that day, Jane Doe No. 3 did not tell her she had been touched. According to her recollection, it was not until October of 2006 that Jane Doe No. 3 told her what happened. She took Jane Doe No. 3 to file a police report on April 28, 2007.

Jane Doe No. 3 was interviewed by a social worker from C.A.S.T. in May 2007. The C.A.S.T. interview was recorded and the DVD of the interview was played for the jury. She told the interviewer she had been left alone with a male neighbor while his

6

wife and children were out grocery shopping. Her mother went to the hospital and Jane Doe No. 2 accompanied her. When asked about the incident, she recalled the male neighbor instructed her, "put your mouth on it . . . put it farther." Jane Doe No. 3 drew a picture of the incident, in which she depicted a stick figure with a bump on its midsection and a second stick figure with a circle in the mouth area to indicate an open mouth. She told the interviewer the bump represented the male neighbor's "weenie" and the second figure represented her. When the interviewer asked her, "So his weenie went where?" she responded, in my "mouth." Jane Doe No. 3 drew an arrow from her mouth to her drawing of the man's penis. A photograph of Jane Doe No. 3's drawing was shown to the jury. At the end of the interview, the interviewer showed her a picture of defendant, to which Jane Doe No. 3 replied, "Um, that's him. I think."

After the close of evidence, argument by counsel and jury instructions, the jury retired to the jury room to deliberate at 10:40 a.m. on November 13, 2013. Early in the afternoon, the jury requested a read-back of Jane Doe No. 2's testimony. That testimony was read back by the court reporter. The next morning, November 14, the jury requested more testimony to be read to them. This time, they wanted the testimony of Jane Doe No. 1 "relating to [Jane Doe No. 2 or A.W.]." That testimony was also read back. At 10:26 a.m., the jury sent the following note: "The jury is at an impasse on one count. Further deliberation will not sway any juror. All evidence has been reviewed. [¶] Please advise our next step . . . ."

The court conferred with counsel. The court proposed reading CALCRIM No. 3551 to the jury, and defense counsel objected. After overruling the objection, the court read the instruction to the jury.

CALCRIM No. 3551 as read to the jury states: "Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more counts. Please consider the following suggestions: [¶] Do not hesitate to re-examine your own views. Fair and effective jury deliberations require a

7

frank and forthright exchange of views. Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors. [¶] It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. [¶] Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. [¶] Both the People and the defendant are entitled to the individual judgment of each juror. It is up to you to decide how to conduct your deliberations. [¶] You may want to consider new approaches in order to get a fresh perspective. Let me know whether I can do anything to help you further, such as give additional instructions or clarify instructions I have already given you. [¶] Please continue your deliberations at this time. If you wish to communicate with me further, please do so in writing using the form my bailiff has previously provided to you." The court further stated: "I am going to send you back into the jury room. Consider the instruction I just read to you. And you may then determine whether or not you want to make any additional requests of the court."

The record reflects the jury returned to its deliberations. At some point during the same morning session, the jury sent a note to the judge which read: "We the jury in the above-entitled action request the following: Read back of [Jane Doe No. 3's] testimony including judge's admonitions to jury and read back of [Jane Doe No. 2's] testimony relating to what occurred in the bathroom."

Both counsel reviewed the court reporter's notes. They agreed upon which portion of the notes should be read to the jury. The court admonished the reporter to decline to answer any questions and to read only the specified portion of the notes. The jury was sent to lunch and the court reporter was sent into the jury room at 1:45 p.m. The read-back was completed at 2:09 p.m. At 2:28 p.m., the jury informed the bailiff they had reached verdicts.

8

The jury found defendant guilty on counts one through five, and found it to be true he committed lewd acts upon multiple child victims. The jury further found it to be true defendant had substantial sexual conduct with Jane Doe No. 3.

II

DISCUSSION

Defendant argues the trial court prejudicially violated his federal and state constitutional right to a unanimous verdict when it told the deadlocked jurors that the jurors had a duty to return to deliberations to "consider new approaches in order to get a fresh perspective . . . with the goal of reaching a verdict." The Attorney General contends the jury was not coerced into reaching a verdict.

"The determination, pursuant to [Penal Code] section 1140, whether there is a "'reasonable probability'" of agreement, rests within the sound discretion of the trial court. [Citation.] Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived "'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered." [Citation.]' [Citation.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 539.)

"In *People v. Gainer* (1977) 19 Cal.3d 835, this court noted that the term '*Allen* charge' encompassed 'a variety of permutations and amplifications' of wording in a controversial instruction that was given to a deadlocked jury in *Allen v. United States* (1896) 164 U.S. 492. (*Gainer*, at p. 845; see *id.* at p. 843, fn. 3.) The *Gainer* court identified two aspects of *Allen* instructions that introduced 'extraneous and improper considerations into the jury's debates,' and held that 'it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues

9

before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried.' (*Gainer*, at p. 852.)" (*People v. Butler* (2009) 46 Cal.4th 847, 883.)

In *People v. Hinton* (2004) 121 Cal.App.4th 655, 662, the Court of Appeal cited a treatise which states the most questionable feature of an *Allen* instruction is the discriminatory admonition directed to minority jurors to rethink their position in light the majority's views. *People v. Garner*, *supra*, 19 Cal.3d 835 also discussed the dangers involved with an admonition to minority jurors: "The instruction skews the deliberative process in a particular direction—toward the result favored by the majority. More significantly, this error is introduced at a crucial stage when the jury looks to the bench for advice on how to solve their dilemma." (*Id.* at p. 854.)

From the foreperson's note to the court, it appears as if the jurors had agreed on all but one count. The court informed the jurors that deadlocked juries are sometimes able to resume deliberations and successfully reach a verdict, that jurors should not hesitate to reexamine their views, that each juror must form his or her individual opinion after each has fully and completely considered all of the evidence with the other jurors. The court reminded jurors they had a duty to deliberate with the goal of reaching a verdict without surrendering his or her individual judgment. Jurors were told not to change a position just because it differs from that of other jurors or just to reach a verdict. The trial court here neither encouraged jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them, nor stated or implied that if the jury fails to agree the case will necessarily be retried. We further note the court here did not in any way admonish minority jurors to rethink their position in light of the majority's views. Nothing in the court's instructions placed pressure on jurors, and the jury was entirely free not to reach any verdict at all. Our review of the trial court's instructions to the deadlocked jury shows no improper coercion or legal error.

10

### III

### DISPOSITION

The judgment is affirmed.


                                        MOORE, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


FYBEL, J.