Filed 11/24/15  P. v. Partridge CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHRISTIAN NOEL PATRIDGE,<br><br>        Defendant and Appellant. | Case No. B256860<br><br>(Los Angeles County<br>Super. Ct. No. NA096093) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tomson T. Ong, Judge.  Affirmed.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Andrew S. Pruitt, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Christian Noel Patridge raises a claim of instructional error following his conviction of possession of a firearm by a felon, with prior serious felony conviction and prior prison term enhancement findings.  For the reasons discussed below, the judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

On June 21, 2013, California Highway Patrol Officer Brandon Bailey made a traffic stop on a Ford Focus.  Defendant Patridge, who was sitting in the front passenger seat, had been smoking marijuana.  When Bailey approached the Ford, he noticed the odor and asked who had the marijuana.  Patridge quickly admitted it was his.  Patridge was visibly nervous and shaking despite the summer heat.  As Bailey questioned the other occupants of the Ford, Patridge kept interrupting and trying to answer for them, making Bailey suspicious.  When asked if he had thrown the marijuana out the window, Patridge said, " 'No, I didn't want you to think I was reaching for my - -' " paused, and then added:  " 'It's in my pocket.' "  All this made Bailey "very nervous," so he decided to investigate further.

Bailey put Patridge in the back of his patrol car and then searched the vicinity of the Ford's front passenger seat.  Underneath the seat, Bailey found a 9-mm. handgun wrapped in a bandana.  While sitting in back of the patrol car, Patridge called the Ford driver's cell phone and left a message asking her to tell Bailey that whatever he found in the Ford belonged to her.

Patridge did not present any evidence at trial.

Patridge was convicted of possession of a firearm by a felon, with prior serious felony conviction and prior prison term enhancements (Pen. Code §§ 29800, subd. (a)(1), 667, subds. (b)-(i), 667.5, subd. (b)).[1]  He was sentenced to a prison term of 14 years.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

## CONTENTION

Patridge contends that a jury instruction given midway through deliberations improperly coerced a guilty verdict from a holdout juror.

## DISCUSSION

1. *Background.*

Jury deliberations began on May 6, 2014, after the trial court finished reading a few final instructions following the parties' closing arguments. Among these final instructions were the following:

"The People and the defendant are entitled to the individual opinion of each juror.

"Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should only do so after discussing the evidence and instructions with the other jurors.

"Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors or any of them favor that decision.

"[¶] . . . [¶]

"In your deliberations, do not discuss or consider the subject of penalty or punishment. That subject must not in any way affect your verdict.

"The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. *Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation*." (Italics added; former CALJIC 17.4.1.)

The jury was excused to begin deliberations at 11:50 a.m. That afternoon, at 4:05 p.m., the jury sent the trial court a note which stated: "One juror is having 'difficulty' following the 'instructions.' " Meeting with counsel, the trial court proposed to convey the following written response to the jury: "The instructions of the court is [*sic*] the law. [¶] You must accept and follow the law as I state it to you, regardless of

3

whether you agree with it. If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions. (Instruction 1.00). [¶] If the juror cannot follow the instruction [*sic*] for whatever reason, that juror needs to be identified and needs to write to the court that he or she cannot follow the instructions of the court and, therefore, cannot discharge his or her duties as a juror." After both attorneys agreed with this proposed response, it was sent to the jury.

At 4:20 p.m., the jury delivered a second note to the trial court stating: "Juror #8 . . . wants evening to think about his decision[.] If given more time, can make a decision[.]" At that point, the jury was excused and ordered to return the following morning. The jury resumed deliberations the next day at 9:35 a.m., and reached a verdict at 10:15 a.m.

Patridge contends the trial court's mid-deliberation instruction, given in response to the jury's first note, violated his rights to a jury trial and a unanimous verdict.

2. *Legal principles.*

"A jury has the 'undisputed power' to acquit, even if its verdict is contrary to the law instructed upon by the court and contrary to the evidence." (*People v. Fernandez* (1994) 26 Cal.App.4th 710, 714.) Nevertheless, California law disapproves of having a trial court inform the jury of this inherent power of nullification. (See *People v. Baca* (1996) 48 Cal.App.4th 1703, 1707 ["The California cases, while recognizing the jury's 'undisputed power' to acquit regardless of the evidence of guilt, reject suggestions that the jury be informed of that power, much less invited to use it."]; *People v. Partner* (1986) 180 Cal.App.3d 178, 185-186 [jury should not be instructed on jury nullification; although jury has raw power to disregard the law, this power should not be legitimized by an instruction]; see also *United States v. Dougherty* (D.C. Cir. 1972) 473 F.2d 1113, 1136-1137 [jury should not be instructed on nullification doctrine; rather, the jury "must itself identify the case as establishing a call of high conscience, and must independently initiate and undertake an act in contravention of the established instructions"].)

4

At the same time, however, trial courts have been directed to refrain from explicitly advising juries against exercising their power of nullification. Former CALJIC No. 17.41.1, one such "anti-nullification" instruction, stated according to our Supreme Court: " 'The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on [penalty or punishment, or] any [other] improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.' [Citation.]" (*People v. Engelman* (2002) 28 Cal.4th 436, 441-442 (*Engelman*).) This instruction, which directs jurors to report any fellow juror who refuses to deliberate or expresses an intent to disregard the law, was one of those given to Patridge's jury just before it began deliberating.

Our Supreme Court held in *Engelman* that it was not reversible error for the trial court to have given this anti-nullification instruction. However, *Engelman* also directed that the instruction not be given in future cases: "We agree with the Court of Appeal that the instruction does not infringe upon defendant's federal or state constitutional right to trial by jury or his state constitutional right to a unanimous verdict, and uphold the Court of Appeal's decision affirming the judgment of conviction. As we shall explain, however, caution leads us to conclude that in the future the instruction should not be given in criminal trials in California. Although jurors have no right to refuse to deliberate or to disregard the law in reaching their decision, we believe the instruction has the potential to intrude unnecessarily on the deliberative process and affect it adversely – both with respect to the freedom of jurors to express their differing views during deliberations, and the proper receptivity they should accord the views of their fellow jurors. Directing the jury immediately before deliberations begin that jurors are expected to police the reasoning and arguments of their fellow jurors during deliberations, and immediately advise the court if it appears that a fellow juror is deciding the case upon an 'improper basis,' may curtail or distort deliberations. Any juror is free, of course, to bring to the court's attention any perceived misconduct that occurs in the course of jury

5

deliberations. In our view, however, it is not conducive to the proper functioning of the deliberative process for the trial court to declare – before deliberations begin and before any problem develops – that jurors should oversee the reasoning and decisionmaking process of their fellow jurors and report perceived improprieties in that process to the court." (*People v. Engelman*, *supra*, 28 Cal.4th at pp. 439-440.)

*Engelman* also explained that, despite the potential problems raised by giving an anti-jury nullification instruction, giving the instruction was not reversible error because "[t]he Court of Appeal was correct in determining that the jury has the duty to follow the court's instructions and that the jury lacks the right to engage in nullification" (*People v. Engelman*, *supra*, 28 Cal.4th at p. 441) and, "[a]s defendant hardly can dispute, the jury must follow the court's instructions, 'receiv[ing] as law what is laid down as such by the court.' (§ 1126.)[2] A juror who actually refuses to deliberate is subject to discharge by the court [citation], as is a juror who proposes to reach a verdict without respect to the law or the evidence. [Citation.] And in cases not involving the death penalty, it is settled that punishment should not enter into the jury's deliberations. [Citations.] Finally, the court does have a duty to conduct reasonable inquiry into allegations of juror misconduct or incapacity – always keeping in mind that the decision whether (and how) to investigate rests within the sound discretion of the court. [Citations.]" (*People v. Engelman*, at p. 442.)

3. *Discussion*.

As recently as *People v. Banks* (2014) 59 Cal.4th 1113, 1171 (disapproved on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3), our Supreme Court noted: "We have repeatedly affirmed *Engelman*'s holding that CALJIC former No. 17.41.1 [does] not violate a defendant's right to a fair trial. [Citations.] Nor did giving CALJIC former No. 17.41.1 violate defendant's right to due process here, where

---

**2** Section 1126 states: "In a trial for any offense, questions of law are to be decided by the court, and questions of fact by the jury. Although the jury has the power to find a general verdict, which includes questions of law as well as of fact, they are bound, nevertheless, to receive as law what is laid down as such by the court."

6

there is no suggestion that any juror was hampered in his or her deliberation or was coerced into changing his or her views as a result of the instruction. [Citation.]"

In apparent acknowledgment of this prevailing case law, Patridge largely ignores the fact that CALJIC No. 17.41.1 was given to his jury before it began deliberating, and instead focuses on the trial court's response to the first jury note. Trying to analogize to the so-called *Allen* dynamite instruction -- used to force a verdict from a deadlocked jury by directing minority voters to reconsider their verdict in light of the fact they are not in the majority -- that was disapproved in *People v. Gainer* (1977) 19 Cal.3d 835, 841-842 (*Gainer*) (disapproved on other grounds in *People v. Valdez* (2012) 55 Cal.4th 82, 163), Patridge argues that the trial court's mid-deliberation instruction violated due process by coercing a guilty verdict from his jury.

In *Gainer*, the trial court was informed that the jury was having difficulty reaching a verdict with the numerical count standing at 11 to 1. The trial court responded by giving the jury an instruction which included the following language:

" 'In a large proportion of cases and perhaps strictly speaking, in all cases, absolute certainty cannot be attained or expected. Although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions and not a mere acquiescence in the conclusion of his or her fellows, yet in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And, with this view, it is your duty to decide the case, if you can conscientiously do so.

7

"[¶] . . . [¶]

" 'And . . . if much the larger of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women equally honest, equally intelligent with himself or herself, and [who] have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath.

" 'And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows.

" 'That is given to you as a suggestion of the theory and rationale behind jurors coming to a decision one way or the other." (*People v. Gainer*, *supra*, 19 Cal.3d at pp. 841-842.)

*Gainer* noted that this "instruction, which is of a type commonly referred to either as the '*Allen* charge' or the 'dynamite charge,' has had a controversial history since it was cursorily approved by the United States Supreme Court in the case of *Allen v. United States* (1896) 164 U.S. 492 [41 L.Ed. 528, 17 S.Ct. 154]. Because it instructs the jury to consider extraneous and improper factors, inaccurately states the law, carries a potentially coercive impact, and burdens rather than facilitates the administration of justice, we conclude that further use of the charge should be prohibited in California." (*People v. Gainer*, *supra*, 19 Cal.3d at pp. 842-843.)

In reversing the defendant's conviction, *Gainer* detailed the serious problems presented by this kind of jury instruction: "The first and most questionable feature is the discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views. . . . A second controversial element in *Allen*-type instructions, not approved in *Allen* itself, is the direction given by the court below that 'You should consider that the case must at some time be decided.' " (*People v. Gainer*, *supra*,

8

19 Cal.3d at p. 845.)  "The one or more 'holdout' jurors are told that in reaching their independent conclusions as to whether or not a reasonable doubt of the defendant's guilt exists, they are to weigh not only the arguments and evidence but also their own status as dissenters – a consideration both rationally and legally irrelevant to the issue of guilt." (*Id*. at p. 848, fn. omitted.)  "Moreover, the extraneous majoritarian appeal contained in the *Allen* instruction interferes with the jury's task in a way which threatens the defendant's right under the California Constitution to have his guilt or innocence determined by the unanimous verdict of a jury of 12 persons.  [Citations.]  'Unanimity obviously requires that each juror must vote for and acquiesce in the verdict. Acquiescence simply because the verdict has been reached by the majority is not an independent judgment, and if permitted, would undermine the right to a unanimous verdict.'  [Citation.]  The open encouragement given by the charge to such acquiescence is manifestly incompatible with the requirement of independently achieved jury unanimity.  [¶]  It follows that even if it were possible to demonstrate that *Allen*'s admonition to dissenters were without appreciable effect on a jury, it would nevertheless be objectionable as a judicial attempt to inject illegitimate considerations into the jury debates as an appeal to dissenting jurors to abandon their own independent judgment of the case against the accused." (*Id*. at pp. 848-849.)

Contrary to Patridge's reasoning, our Supreme Court has expressly rejected any simple analogy between the dynamite instruction condemned in *Gainer* and the anti-nullification instruction cautioned against in *Engelman*:  "[*Engelman*] acknowledged that the instruction 'creates a risk to the proper functioning of jury deliberations and that it is unnecessary and inadvisable to incur this risk' [citation], but nevertheless found no constitutional infirmity with respect to either the right to trial by jury or to a unanimous verdict. [Citation.]  In particular, we rejected the analogy – also drawn by defendant here – to the 'dynamite' instruction disapproved in [*Gainer*.]  'CALJIC No. 17.41.1 does not share the flaws we identified in *Gainer*.  The instruction is not directed at a deadlocked jury and does not contain language suggesting that jurors who find themselves in the minority, as deliberations progress, should join the majority without reaching an

9

independent judgment. The instruction does not suggest that a doubt may be unreasonable if not shared by a majority of the jurors, nor does it direct that the jury's deliberations include such an extraneous factor. CALJIC No. 17.41.1 simply does not carry the devastating coercive charge that we concluded should make us "uncertain of the accuracy and integrity of the jury's stated conclusion" and uncertain whether the instruction may have " 'operate[d] to displace the independent judgment of the jury in favor of considerations of compromise and expediency.' " [Citation.]' [Citation.]" (*People v. Brown* (2004) 33 Cal.4th 382, 393.)

Patridge nevertheless maintains there was error in his case because the trial court's mid-deliberation instruction "clearly constituted a direction for a holdout to reconsider his views." He asserts: "While not directed at a necessarily deadlocked jury, it is obvious that there was a dissenter and the instruction was directed at that particular juror. *It directed the dissenter to reconsider his position in light of the majority's view that he was having trouble following the law*." (Italics added.)

We disagree. The trial court's mid-deliberation instruction, on its face, did *not* direct "a holdout juror" to "reconsider his views." Preliminarily, we would note that Patridge is merely speculating that Juror No. 8 was a lone holdout juror: the first jury note did not say a deadlock had been reached, nor that the jury was currently split 11 to 1. More importantly, though, the trial court's mid-deliberation instruction did not say any of the impermissible things that an *Allen* instruction would have said: it did not "contain language suggesting that jurors who find themselves in the minority . . . should join the majority without reaching an independent judgment," nor did it "suggest that a doubt may be unreasonable if not shared by a majority of the jurors." (*People v. Engelman*, *supra*, 28 Cal.4th at pp. 444-445.) Instead, the instruction directed Juror No. 8 to notify the court if he felt he could not follow the jury instructions, and among the instructions Juror No. 8 heard just before retiring to deliberate was an advisement that "[t]he People and the defendant are entitled to the individual opinion of each juror," and that each juror "must decide the case for yourself" and "not decide any question in a particular way because a majority of the jurors or any of them favor that decision."

10

Hence, none of the improper coerciveness condemned by *Gainer* was inherent in the trial court's response to the first jury note.  Moreover, there is no indication that the problematic aspects of CALJIC No. 17.41.1 identified by *Engelman* were realized.  Once the first jury note disclosed an issue with respect to one of the deliberating jurors, the trial court's subsequent instruction did not "intrude unnecessarily on the deliberative process and affect it adversely – [either] with respect to the freedom of jurors to express their differing views during deliberations, [or with respect to] the proper receptivity they should accord the views of their fellow jurors." (*People v. Engelman*, *supra*, 28 Cal.4th at p. 440.)  The trial court merely repeated its earlier admonition that Juror No. 8, like all of the jurors, was required to follow the jury instructions, and that he should inform the court if he believed he could not do so.  There was no improper coercion of a guilty verdict in this case.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.

We concur:


ALDRICH, J.


JONES, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.