Filed 4/23/25  P. v. Sanchez CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | A169733 |
| v. | |
| PEDRO ZEPEDA SANCHEZ, | (Lake County |
| Defendant and Appellant. | Super. Ct. No. CR963203) |

Defendant Pedro Zepeda Sanchez appeals from his conviction on a jury verdict finding him guilty of continuous sexual abuse of a child in violation of Penal Code section 288.5, subdivision (a).  He also appeals from an order imposing certain fines and fees on him at sentencing.

Defendant's principal claim on appeal is that, when the jury foreperson reported an eleven-to-one deadlock after less than a day's deliberations, the court erred by denying his motion for a mistrial and instructing the jury to resume deliberating.

Defendant attacks the fines and fees order on the ground that, despite having received a full opportunity to demonstrate that he had no ability to pay—including an evidentiary hearing—the court erred by declining to accept his testimony that there is no "usable equity" in property shown to be worth $60,000 on an asset statement subscribed by him under penalty of perjury.

1

We reject these arguments and affirm the conviction and sentence.

## I.

When the charged offenses in this case took place, defendant and M.M. had lived together as boyfriend and girlfriend for approximately seven years. Living with them were M.M.'s five young children, two daughters and three sons. The victim of defendant's sexual abuse, A.M., is one of M.M.'s daughters. The offenses took place between March of 2020, when defendant, M.M., and M.M.'s children were living in Clearlake, and August 2020, when they all moved to Kelseyville. A.M. was 12 years old at the time.

The case was tried to a jury over the course of two days in late November and early December 2023. At trial, A.M. testified to eight incidents in which defendant touched her in a sexual manner when defendant was alone with A.M. Each incident took place in a different way, but they shared certain common patterns. In some of the incidents, defendant rubbed A.M.'s breasts and vagina, or on one occasion, just her vagina; in several incidents, defendant placed A.M. on top of him while he was sitting or reclining, and each time A.M. felt defendant's erect penis on her buttocks; once, he pushed A.M. against a sink, began rubbing her stomach from behind and pushed his erect penis against her buttocks; and once, he tried to place A.M.'s hands on his erect penis. M.M. testified that, after A.M. disclosed these incidents, she reluctantly came to believe A.M.

Defendant exercised his privilege not to testify. His defense centered on whether there was a reasonable doubt as to the credibility of A.M. and M.M.

In the late afternoon of Friday, December 1, following the close of evidence and presentation of arguments from counsel, the jury retired to begin deliberations. They deliberated for an hour that day, then resumed the

2

following Wednesday, December 6 at 9:00 a.m.  At about 9:45 a.m. the jury sent a note to the judge inquiring about whether there were any recorded statements to law enforcement or child protection services from any of A.M.'s brothers, and after deliberating for less than another half hour, the jury reported that it was deadlocked.

The judge then met with the jury in court.  The jury foreperson expressed the view that the prospect of resolving the deadlock was hopeless. The judge inquired how many ballots had been taken, and asked about the vote breakdown on the last ballot, carefully limiting the questions so that the identities of the jurors and whether the vote was for or against conviction was not revealed.  The foreperson reported that "less than five" votes had been taken and that the breakdown was eleven to one.  Ten other jurors agreed that they saw no hope of resolving the deadlock.  One juror felt there was hope the deadlock could be resolved.

At that point, outside the presence of the jury, the trial court conferred with the parties and with counsel about what to do next.  The People took the position that, in light of the short deliberations to the point of impasse, the court should direct the jury to resume deliberations.  The defense took the opposite position, arguing that, given the eleven-to-one split after what was a fairly straightforward trial presentation, and the reports from all but one juror that the prospect of a verdict was hopeless, it would be inherently coercive to the holdout juror for the court to order a resumption of deliberations.  The defense moved for a mistrial.

The trial court denied the mistrial motion, and chose to instruct the jury to continue deliberating.  The court's instruction, drawn from CALCRIM No. 3551 without material change, read as follows:

3

"Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict. Please consider the following suggestions. Do not hesitate to reexamine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. Both the People and the defendant are entitled to the individual judgment of each juror. [¶] It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective. Let me know whether I can do anything to help you further such as give you additional instructions or clarify instructions I have already given you. [¶] Please continue your deliberations at this time. If you wish to communicate with me further, please do so in writing as you have been doing."

Upon receiving this instruction, the jury resumed deliberations. After requesting and receiving a readback of A.M.'s testimony and playback of a video interview A.M. gave to an investigator, the jury announced a guilty verdict at 3:46 p.m. on December 6, 2023. Speaking to the entire panel after the verdict was delivered, the judge confirmed the unanimity of the jurors' votes by asking any juror who felt the verdict did not reflect his or her views to raise a hand. No one raised a hand.

At that point, defendant waived his right to jury trial on the alleged aggravating factors, and the judge found true that he had abused a position of trust. The court found in mitigation that defendant had an insignificant

criminal record and satisfactory prior performance on probation. Based on the balance between aggravating and mitigating factors, the court imposed a midterm sentence of 12 years imprisonment.

In addition, the court imposed a $3,600 restitution fine pursuant to Penal Code section 1202.4, subdivision (b), a $40 assessment pursuant to Penal Code section 1465.8, a $30 assessment pursuant to Government Code section 70373, and a $300 fine pursuant to Penal Code section 290.3. Defendant objected to the imposition of the fees and fines under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). After holding an evidentiary hearing on the ability to pay issue, the court found defendant had the ability to pay the fines and fees.

## II.

### A.

Defendant urges reversal of his conviction on the ground that the trial court erred by giving an instruction directing the jury to resume deliberations after reporting a hopeless deadlock. He contends that, because this was a simple and straightforward case and all but one of the jurors reported that further deliberations would be pointless, it was an abuse of discretion to give this instruction. He also argues that the instruction violated his due process rights to a fair and impartial jury. He also reiterates the contention he argued below that, given the eleven-to-one vote split, the giving of CALCRIM No. 3551 was inherently coercive to the holdout juror.

The People respond that defendant forfeited any objection to CALCRIM No. 3551 by failure to object in the trial court, and that, even if we address the objection on the merits, we should reject it because, on this record, under the governing abuse of discretion standard of review, defendant has failed to carry his burden of showing that the trial court's decision to give CALCRIM

5

No. 3551 was irrational, arbitrary, or not grounded in reasoned judgment and guided by correct legal principles.

We do not agree that defendant has forfeited his objection to CALCRIM No. 3551, since he made a mistrial motion before the giving of the instruction and in the course of doing so plainly objected to the giving of *any* instruction directing the jury to resume deliberations. His argument here is an attack on the giving of CALCRIM No. 3551, not on the form of the instruction. On the merits, however, the People are correct. We see no error in the giving of the instruction on the record presented here.

Long ago, in *People v. Gainer* (1977) 19 Cal.3d 835, 845 (*Gainer*), overruled in part in *People v. Valdez* (2012) 55 Cal.4th 82, 163 (*Valdez*), the California Supreme Court discussed in depth the practice of trial judges giving exhortatory instructions "as a means of 'blasting' a verdict out of a deadlocked jury . . . ." (*Gainer*, at p. 844.) At the time, some 50 years ago, this practice was controversial, having been subject to a "withering barrage of attacks" from some courts. (*Id*. at p. 846.) Such an instruction—given the moniker of an "*Allen* charge" in the reported cases[1]—could be so heavy-handed that it had the effect of hectoring holdout jurors into sacrificing their independence for the sake of unanimity. (*Id*. at pp. 844, 848.)

The *Gainer* court focused specifically on two issues raised by the form of instruction at issue there. First, the instruction was a "discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views" (*Gainer, supra,* 19 Cal.3d at p. 845) and was therefore improper, inasmuch as, by counseling minority jurors to consider the

---

[1] The name comes from *Allen v. United States* (1896) 164 U.S. 492, where the United States Supreme Court approved a jury instruction which encouraged minority jurors to reexamine their views in light of the views expressed by the majority. (*Id*. at pp. 501–502.)

majority view, whatever it might be, the instruction encouraged jurors to abandon a focus on the evidence as the basis of their verdict. (*Id*. at p. 848.) A second issue identified in *Gainer* was a direction that the jury " 'should consider that the case must at some time be decided.' " (*Id*. at p. 851.) This feature of the instruction, the court noted, was simply inaccurate because of the possibility the case might not be retried. (*Id*. at p. 852.) Neither of these two problematic features is present in this case.

The law pertaining to "*Allen* charge" instructions has also evolved significantly since *Gainer*. Many of the most controversial forms of these instructions were adopted as ad hoc "embellishments" on the instructional text approved by the United States Supreme Court in *Allen v. United States*, *supra*, 164 U.S. 492. (*Gainer*, *supra*, 19 Cal.3d at p. 844.) Since the late 1970s, with the increased utilization of standardized jury instructions— vetted in our state by the Judicial Council to avoid the particular problems *Gainer* identified—cases reversing for error in the giving of an "*Allen* charge" are few. In fact, while defendant cites more than a dozen California cases decided since *Gainer* addressing the propriety of *Allen* charges, not one of them reverses a conviction for error in such an instruction. And the only case defendant cites that involved asserted error in the giving of CALCRIM No. 3551, which was adopted in 2012, approves that standard form instruction in particular. (*People v. Sta Ana* (2021) 73 Cal.App.5th 44, 62– 64.)

We are not persuaded by defendant's argument that, on this record, it was error to give CALCRIM No. 3551 to a deadlocked jury because the case is simple, and while the deliberation time to deadlock (a few hours) was relatively brief, it amounted to half the time it took to try the case. *People v. Moore* (2002) 96 Cal.App.4th 1105 is instructive. "[P]resumably because of

the relatively brief duration of deliberations conducted by the jurors before they announced they could not reach a verdict," the *Moore* court stated, "the trial court concluded further deliberations might be beneficial . . . . The fact the jury was able to reach a verdict relatively quickly after being further instructed reflects the court properly exercised its discretion." (*Id*. at p. 1122.) So too here.

Defendant contends that unlike in *Moore*—where the trial court made no inquiry about the jury's vote split—in this case the trial judge knew the vote was split eleven to one and was aware that one juror was taking an isolated position contrary to all of his fellow jurors. But while the California Supreme Court has recognized that an eleven-to-one split may increase the *potential* for coercion, the court has consistently rejected the argument that it is inherently coercive. (*People v. Bell* (2007) 40 Cal.4th 582, 617–618, overruled on other grounds, *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; *People v. Homick* (2012) 55 Cal.4th 816, 901; *People v. Sheldon* (1989) 48 Cal.3d 935, 959.)

Notably, when we survey the pertinent case law, instructions to resume deliberating have been upheld after a wide range of deliberation times leading to impasse. (See *People v. Thomas* (2023) 14 Cal.5th 327, 402 [no abuse of discretion where jury deliberated four hours before announcing deadlock at penalty phase]; *People v. Debose* (2014) 59 Cal.4th 177, 208–209 (*Debose*) [two-month trial, day and a half of penalty phase deliberations]; *People v. Sandoval* (1992) 4 Cal.4th 155, 195 [three days deliberation after a five-month trial]; *People v. Sheldon, supra,* 48 Cal.3d at pp. 958–959 [two days of deliberation, only one vote taken before announcing deadlock in penalty phase of multiple special circumstance case including alleged prior kidnapping and attempted murder offenses].)

No formulaic rule for handling deadlocked juries may be drawn from these cases. So long as balanced instructions are given that do not put a judicial thumb on the scale for or against any juror's point of view (*Valdez*, *supra*, 55 Cal.4th at p. 164), trial courts have broad discretion to order further deliberations. The applicable test is simply that, in the specific circumstances presented, courts may order further deliberations based on a reasonable assessment that such an instruction will enable the jurors to " ' " 'enhance their understanding of the case . . . .' " ' " (*Debose*, *supra*, 59 Cal.4th at p. 209.) Presented with an appellate challenge to such a determination, our review is for abuse of discretion. (*Ibid*.) We see no abuse of discretion here.

## B.

Citing *Dueñas, supra,* 30 Cal.App.5th 1157, and *People v. Cowan* (2020) 47 Cal.App.5th 32, review granted June 17, 2020, S261952, defendant claims the court erred by imposing various fees and fines on him despite his claim of inability to pay.

At an evidentiary hearing on the issue of ability to pay, the court received into evidence "a statement of assets signed under penalty of perjury." In his testimony about that asset statement, defendant acknowledged he had signed a statement under penalty of perjury showing he owned 1.3 acres of property valued at $60,000. His mortgage was $735 per month, he owed about $20,000, and he had $40,000 in equity. Defendant was "certain" the bank would not "hold the mortgage open" if he were incarcerated for 12 years, during which he claimed to have no way of earning money and no passive income.

Based on defendant's sworn statement that he owned property worth $60,000 and the inference from his testimony that he had at least $40,000 in equity in that property, the court rejected defendant's claim of inability to

9

pay his fines and fees. Here on appeal, the gist of defendant's argument is that the court erroneously relied on defendant's ability to sell the property and realize profit from the sale, because, legally, he could not do so because he financed the property under a land sale contract.

We are unpersuaded. Inability to pay fines and fees is a factual issue for trial courts to assess. The trial court was not required to delve into, determine, and resolve in defendant's favor, defendant's claim that the listed property on his asset statement had no "usable" equity in it. The premise of that argument turned on self-serving testimony from defendant—at that point a convicted felon—about the legal status of his ownership of the property on his asset statement and conjecture about events in the future.

Plainly, the court disbelieved defendant's testimony about his inability to access any equity value in property he admittedly owned. Without that testimony, defendant's sworn asset statement, by itself, constitutes substantial evidence that he had the ability to pay his fees and fines. Defendant was fully heard on the ability to pay issue, which is all that *Dueñas* and *Cowan* require.

## DISPOSITION

Affirmed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.

10