Filed 4/30/26  P. v. Geary CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE, | B340003 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA119175) |
| v. | |
| MARCO ANTONIO GEARY, | |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed with directions.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller, Charles S. Lee, and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

At approximately 2:00 a.m. on September 23, 2018, a group of people—including 19-year-old Jay Espinoza—left a nightclub near the Fox Theater in Pomona.  As the group was crossing the street, a dark blue sports utility vehicle (SUV) drove through the intersection at a high rate of speed.  The SUV nearly struck the pedestrians, and one or more people in the group gestured and yelled at the vehicle's occupants.  The SUV circled the block and stopped next to the group.  Espinoza approached the SUV and confronted the passenger sitting in the front seat.  One of the SUV's occupants then opened the vehicle's rear passenger-side door and fired several shots.  Espinoza suffered three gunshot wounds, two of which proved fatal.

Surveillance footage and eyewitness accounts implicated three purported members of the South Side Pomona gang— appellant Marco Geary, Gabriel Cervantez, and Gabriel's brother, Everette Cervantez[1]—in the shooting.  And when officers arrested and interviewed Gabriel, he identified Geary as the shooter.  The district attorney charged all three men with Espinoza's murder, but Gabriel and Everette resolved their cases by pleading no contest to charges of assault with a firearm (Pen. Code, § 245, subd. (a)(2)).[2] Geary proceeded to trial on the murder charge.  Gabriel testified at the trial, albeit unwillingly.  Following several days of deliberations and supplemental closing arguments by the prosecution and defense, the jurors convicted Geary of second degree murder.  The court sentenced him to 40 years to life in prison.

Geary now asks us to reverse his conviction, arguing that (1) insufficient evidence corroborates the statements from Gabriel,

---

[1] Because Gabriel and Everette share a last name, we refer to them by their first names.

[2] Further statutory references are to the Penal Code.

2

an accomplice to the crime, (2) the trial court abused its discretion in admitting gang expert testimony because, in doing so, it relied on the prosecutor's mistaken representation that Gabriel had identified Geary as a South Side Pomona gang member, (3) the gang expert introduced racial bias into the trial, in violation of the Racial Justice Act of 2020 (Stats. 2020, ch. 317) (RJA), (4) the court coerced the verdict by providing an improper "*Allen*"[3] charge to the jury during deliberations, and (5) the cumulative effect of the trial errors mandates reversal.

We, however, conclude that Geary is not entitled to relief: Substantial evidence in the form of videos, photographs, and eyewitness testimony corroborates Gabriel's statements. The record does not support that the court relied on the prosecutor's incorrect representation in deciding to admit the gang expert's testimony. Geary fails to demonstrate the gang expert's comments violated the RJA. And the court's mid-deliberation instructions to the jurors accurately stated the law and did not coerce their verdict. Finally, the absence of any individual errors defeats Geary's cumulative error argument.

Accordingly, we affirm with directions to the trial court to correct an error in the calculation of Geary's custody credits.

## FACTUAL SUMMARY AND PROCEDURAL HISTORY

We summarize only the facts and procedural history relevant to our resolution of this appeal.

### A.  The Charges and the Codefendants' Pleas

In 2019, the district attorney charged Geary, Gabriel, and Everette with Espinoza's murder (§ 187, subd. (a)) (count 1). The district attorney further alleged that Geary "personally and

---

[3] *Allen v. United States* (1896) 164 U.S. 492 (*Allen*).

3

intentionally discharged a firearm, a handgun, which proximately caused" Espinoza's death (see § 12022.53, subd. (d)) and that the defendants committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). In addition, the district attorney charged Geary with possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 2) in connection with the incident.

In 2021, Gabriel and Everette each pleaded no contest to assault with a firearm (§ 245, subd. (a)(2)) in exchange for dismissal of the murder charge pending against them. In addition, Gabriel and Everette admitted they committed the assault for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(B)). Pursuant to the plea agreements, the trial court imposed a seven-year prison sentence on each of them.

Geary elected to proceed to trial.

### B. Pretrial Hearing Concerning the Admissibility of Gang-Related Evidence

At the January 2024 final pretrial hearing, defense counsel moved to bifurcate the gang allegation from the remainder of the case and moved to exclude all gang-related evidence from the initial phase of the trial. The court granted the bifurcation motion and heard argument concerning the admissibility of gang evidence in the first phase of the trial.[4]

The prosecutor argued, in pertinent part: "Our theory of the case is [Geary] along with [Gabriel and Everette] are all members of South Side Pomona. They were hanging out at the Flying J bar here in downtown Pomona on the night of the incident. As they

---

[4] Following Geary's conviction for murder, the prosecution moved to dismiss the gang allegation in the interest of justice. The court granted the motion, and the trial therefore never proceeded to a second phase.

departed, the three of them in an SUV traveled at a high rate of speed southbound [on] Garey nearly striking some pedestrians who were crossing in the crosswalk area.  Some of these pedestrians, based on the video and witness statements, verbally expressed their distaste for the near strike and almost immediately [Geary, Gabriel, and Everette] circled the block at a high rate of speed, approached the group that had just crossed the crosswalk, and then immediately there was a confrontation.  It's our theory that defendant Geary was the rear passenger who exited and, without any provocation, produced a handgun and shot the victim, Jay Espinoza, approximately five times.

"[¶] . . . [¶]

"So what we're seeking to do is we're seeking to introduce evidence of defendant Geary's gang membership in South Side Pomona along with [Gabriel's and Everette's] membership and show that the reason for the shooting was to back up a fellow gang member and to address the disrespect shown to South Side Pomona by this group of pedestrians."

In support of Geary's alleged gang affiliation, the prosecution proffered that Geary "ha[d] self-admitted his membership in South Side Pomona to several Pomona police officers," and had disclosed his gang membership and moniker, "Little Bam Bam" to an undercover agent in the Pomona jail.  The prosecution further proffered:  "When the detectives interview[ed] Gabriel . . . , who was the driver, the . . .  day [after the shooting] . . . , Gabriel . . . admitted his membership in South Side Pomona [and] *identified defendant Geary as a member of South Side Pomona with the moniker Bam Bam or Bams*."  (Italics added.)

Defense counsel did not dispute the veracity of the prosecutor's proffer, but as set forth, *post*, the prosecutor was

incorrect that Gabriel expressly had identified Geary as a South Side Pomona gang member in his interview with detectives.

At the conclusion of argument, the court ruled that gang evidence "[would] be permitted to be introduced for purposes of motive, but . . . only in that limited way."

## C. Trial Evidence

At trial, the prosecution introduced several categories of evidence in support of its theory that Geary shot and killed Espinoza, including: (1) testimony from four eyewitnesses, (2) surveillance camera footage, (3) live testimony from Gabriel, as well as recordings of his interview with detectives and several jail calls he made to Everette, (4) testimony from Greg Freeman, one of the lead detectives on the case, and (5) testimony from Officer Rodney Cavanaugh, a gang expert.

The defense introduced two still images taken from the prosecution's surveillance footage, but did not otherwise present an affirmative case.

### 1. *Eyewitness Testimony*

J.B., R.G., P.C.G., and S.E. testified as eyewitnesses to the shooting.

J.B. testified that, near the time of the incident, he and his friends were attempting to gain entrance to a night club near the Fox Theater. He saw an SUV drive rapidly down the street and stop near a group of people. A person on the street took his shirt off, "like [he] [was] squaring off to fight." The SUV's "passenger door opened first; and then, . . . the door right behind the passenger, the rear passenger seat—they opened their door, and then they got out. It was kind of loud for a second and then, . . . [he] just hear[d] gunshots instantly." J.B. saw the shooter holding "a black handgun" and saw "the spark from the gun." He described the

6

shooter as "male" and "Mexican or Latino." J.B. further testified that he had "a clear line of sight from where [he was] standing on the corner to where the SUV stopped[,] and [he saw] the front passenger and rear passenger get out just before the shooting [began]."

R.G. testified she witnessed the shooting while standing next to her brother's car. She and her brother had spent the prior two hours at a nearby nightclub, and she was waiting for him to return with the car keys. She had consumed two alcoholic drinks while at the club and "was a little buzzed." She saw "a car kind of just go a little fast in the middle of the street" as a group of people "[were] walking on the crosswalk." "It looked like" one of the cars came close to striking the people. It was "a black SUV or a van." The vehicle then "circled" and reappeared in the middle of the street, "maybe a parking space [distance] in front of" R.G. A man, who R.G. later learned was Espinoza, approached the vehicle, and R.G. "[thought] he threw a punch at the passenger, the guy that was sitting in the front passenger [seat]." "[T]hen someone opened the back door and kind of reached out, didn't fully exit, but he reached out and he had a handgun and then he shot [Espinoza]." R.G. further testified there was nothing between the vehicle and where she was standing that would have blocked her view of the incident. On cross-examination, R.G. testified that she originally told police she saw four people in the vehicle, but she clarified: That "was an assumption I believe I made. . . . [¶] . . . [¶] . . . But I don't know where I'm getting . . . you know, I was also drinking, and I don't know where the fourth person came from."

P.C.G. testified that, at the time of the shooting, she was sitting in her car in a nearby Bank of America parking lot. She was waiting for her boyfriend to deposit or withdraw money. While waiting, she saw a black SUV stop "directly near where [a] group of

7

pedestrians [was] walking." She observed "[m]ore than two people" in the SUV, including "two heads in the rear seat." The driver's side of the car was closest to her, and she did not see any of the doors open on that side of the vehicle. She then heard several gunshots, followed by a woman screaming and a young man crying. She saw a male body on the floor. After hearing the shots, she told her boyfriend "to come inside the car and . . . go to the nearest police [officer]."

Finally, S.E. testified that she was part of the group that had crossed the street with Espinoza. She had met Espinoza for the first time that night. She testified that, as the group crossed the street, she heard the sound of a vehicle traveling through the crosswalk at a high rate of speed. She heard one or more people in the group "shout" in response. S.E. continued walking forward and then "hear[d] a commotion and then [she] remember[ed] hearing gunshots." She further testified: "Sounded like a fight, a quick one, and then gunshots right after." S.E. did not turn around to observe the vehicle or the fight. Immediately after the shooting, she jumped in her friend's car, and the friend retrieved Espinoza's body and drove him to the emergency room five minutes away. Although on direct examination, S.E. testified she did not see the SUV, she confirmed on cross-examination that she previously told detectives that she had seen "a dark-colored SUV[,] probably a Chevy Tahoe type SUV[,] with at least four people inside of it" and that "all the windows in the SUV were rolled down" at the time of the incident.

### 2. *Surveillance Camera Footage and Still Images*

Surveillance camera footage introduced by the prosecution appears to capture Geary, Gabriel, and Everette on the sidewalk near the Fox Theater shortly before the shooting. Geary is wearing a dark gray shirt and a wristband, Gabriel is wearing a light gray

8

shirt, and Everette is wearing a baseball cap. The surveillance footage also shows a dark SUV driving down the street a few minutes later. The front and back passenger-side windows of the SUV are rolled down, and a passenger is visible in each window. The driver appears to be wearing a light gray shirt, and the front passenger is wearing a baseball cap. The back passenger's face also is visible, although his clothing is not visible.

The defense introduced as exhibits two still images— one of Geary, Gabriel, and Everette on the street and one of the individuals visible in the SUV—taken from the prosecution's surveillance footage.

### 3. *Gabriel's Testimony, Prior Recorded Interview with Detectives, and Jail Calls*

Gabriel did not wish to testify, and initially, the prosecution was unsure it would be able to present live testimony from him. In the middle of trial, however, officers arrested Gabriel on a parole violation and transported him to the courthouse to testify. Gabriel answered most of the prosecution's background questions on direct examination. He testified, for example, that he had been released from prison a year and a half earlier after serving approximately three years in prison for assault with a firearm in connection with Espinoza's death. Gabriel also confirmed that the surveillance footage captured him, Geary, and Everette walking on the street near the Fox Theater shortly before the shooting. In addition, Gabriel confirmed that he was driving his girlfriend's dark-colored SUV on the date of the incident, and that the surveillance footage captured Everette as the front passenger and Geary as the rear passenger in the SUV.

But when the prosecution began asking further questions about the shooting, Gabriel replied, "I really don't want to answer these questions." The court then ruled Gabriel a hostile witness

9

and allowed the prosecution to play the recording of Gabriel's interview with detectives (including Detective Freeman) and recordings of three jail calls Gabriel had placed to Everette.

During his recorded interview with detectives, Gabriel said he had been a member of the South Side Pomona gang since he was 15 years old. He did not make any representations concerning Geary's gang status. But he did identify "Bam-Bam," i.e., Geary, as the shooter during the following exchanges with the detectives:

"[Detective]: . . . [W]ho was in the car[?]

"[Gabriel]: There was three of us.

"[Detective]: I know. Who was in the car?

"[Gabriel]: Um, who was that? I think Bam-Bam.

"[Detective]: And who else?

"[Gabriel]: That's it.

"[Detective]: Just you, Everette, and Bam-Bam?

"[Gabriel]: Yeah.

"[¶] . . . [¶]

"[Detective]: Let me ask you this. You were driving. Your brother was where[?]

"[Gabriel]: Passenger.

"[Detective]: Where was Bam-Bam?

"[Gabriel]: Backseat.

"[Detective]: Behind your brother?

"[Gabriel]: Yeah.

"[¶] . . . [¶]

"[Detective]: . . . Who shot him, your brother or Bam-Bam?

"[Gabriel]: Like I said, my brother didn't do nothing.

"[Detective]: Why would Bam-Bam shoot him?

"[Gabriel]: I don't know. . . .

"[¶] . . . [¶]

"[Detective]: Why would Bam-Bam get out of the car?

10

"[Gabriel]: He seen my brother probably. And then he seen him hit my brother, you know?

"[Detective]: Felt disrespected and fucken got mad?

"[Gabriel]: I guess. I don't know. Probably he was drunk or something. I don't know. Like, I don't know."

"[Detective]: . . . Bam-Bam, what do you know his real name to be? I already know who he is, but what—what do you know him, his real name—his real name to be?

"[Gabriel]: Well, Marco[, i.e., Geary]."

Gabriel likewise implicated Geary as the shooter in the following jail call exchanges with Everette:

"[Gabriel]: . . . Fool, that fool—that fool, whatever happened he was sons—his dad's a cop,[5] fool, so we're fucked. Tell him he's fucked. We're—fucken Bam-Bam's—you gotta tell Bam-Bam, fool. I don't know what the fuck, fool.

"[¶] . . . [¶]

"[Gabriel]: . . . [T]hey got a court date set up for me.

"[Everette]: Okay. And then what? And then what? What's gonna happen?

"[Gabriel]: I don't know, bro.

"[Everette]: All right. Well, they're gonna fucken—because, look, if they—if they do that, dog, what you said, Gabriel, then fucken Flaco said he already talked to what's his name. And if they do, then he's just gonna say something that's gonna clear us, you know, us that we don't know, you know?"

"[Gabriel]: I know, fool. But you fucken talk to Bam-Bam, fool, because I'm gonna be in here all day, dog, and I didn't even do shit, fool, and you know it.

---

[5] As a "ruse," detectives had told Gabriel that Espinoza was the son of a police chief.

"[Everette]:  Yeah, fool.  Well, what do I do?  What am I supposed to do?  What do I tell him?

"[¶] . . . [¶]

"[Everette]:  Well, what do I do?  What should I tell fucken what's his name?  What if he says it's just him?

"[Gabriel]:  Then tell him.

"[Everette]:  I don't know.  I need to call you back."

"[Gabriel]:  . . . [T]hey are looking for Bam-Bam.  They want Bam-Bam, fool.

"[Everette]:  They want Bam-Bam?

"[Gabriel]:  Yeah.  They want Bam-Bam bad, fool.  They're looking for him.

"[Everette]:  Why though?

"[Gabriel]:  Just because—I don't know, fool, but they said that they're looking for him, and that maybe I can get—I get to leave, but I don't know, fool.  Like, I'm—I don't know, fool.

"[¶] . . . [¶]

"[Everette]:  . . . They're looking for him; right?  That's what they told you; right?

"[Gabriel]:  Yeah.

"[Everette]:  Then you're good, fool.

"[¶] . . . [¶]

"[Gabriel]:  I'm probably just waiting here until they catch Bam-Bam, or I don't know what the fuck, bro.

"[¶] . . . [¶]

"[Gabriel]:  Tell Bam-Bam to fucken do something quick, fool.

"[Everette]:  That fool, he—I don't know, fool.  He's on his own shit right now, fool.  Flaco, like—I talked to Flaco right now, and, fucken, I don't know.  But how do they know it's him?

"[Gabriel]:  I don't know, bro, but I—they—I'm—if anything, they're gonna let me go down for everyone."

### 4.  *Detective Freeman's Testimony*

Detective Freeman testified that, prior to being assigned to investigate Espinoza's death, he knew Geary through "personal" "contacts with [him] in the past on different investigations and on the streets, on stops, and stuff like that," dating back to 2013. Based on those prior contacts, he knew Geary's nickname to be "Bams or Little Bams or Bam Bam." Detective Freeman further testified that, "[b]efore the interview with Gabriel," he reviewed surveillance footage from the Fox Theater and identified Geary as the rear passenger in the SUV captured in the footage.

### 5.  *Gang Expert's Testimony*

Immediately before the prosecution called Officer Cavanaugh to testify as its gang expert, defense counsel renewed his objection to the testimony. Defense counsel "ask[ed] [the court] to reconsider the issue based on the evidence as it's been presented because it is different [from] what was told to the court initially"—including because Gabriel did not testify concerning "respect or disrespect." Defense counsel further argued: "On top of that, Your Honor, I want to ensure that no hearsay with regards to membership or information is actually presented in front of the jury. . . . [¶] . . . [¶] . . . Officer Cavanaugh testified [at the preliminary hearing] that [Geary] had never admitted to him in the past that he was a gang member. However, he had reviewed databases or something along those lines that confirmed him as a gang member. Those databases, that information, that's hearsay."

The trial court agreed, and the prosecutor explained that he intended to demonstrate Geary's gang membership not via any hearsay, but through "photographs of . . . Geary's tattoos that were taken shortly after arrest pursuant to . . . booking." The trial court then ruled the gang expert testimony admissible.

13

Officer Cavanaugh testified, in pertinent part, that he had "had personal contact with [Gabriel] before this case" and knew him to be a member of South Side Pomona with the nickname " 'Little G' " or " 'G Man.' " He likewise knew Everette, a "self-admitted[ ]" member of South Side Pomona, based on "[s]everal contacts, arrests, investigations and involve[ment] in an arrest of his within the last two and a half months from today's court proceeding." Officer Cavanaugh further testified that Gabriel's and Everette's tattoos—which included the letter S, an image consisting of six Ps surrounded by a hexagon, and the word "Pomona"—"represent[ed] South Side Pomona" gang.

The prosecutor then introduced photographs of Geary's tattoos taken at the time of his arrest in October 2018. The tattoos included (1) the word "Pomona" across his abdomen, (2) six Ps in a hexagon shape on his back, and (3) a large letter S on the upper portion of each of his arms. Officer Cavanaugh testified that Geary's tattoos, like those of Gabriel and Everette, were "significant as [they] relate[d] to Pomona South Side." Officer Cavanaugh further testified that if nonmembers of the Pomona South Side gang were to put similar tattoos on their body, they would suffer "[p]hysical violence leading up to murder . . . [¶] . . . [¶] . . . [by] members of [the] gang." And he opined that a gang member might murder someone who merely assaulted a fellow gang member because the assault would be a sign of disrespect.

Finally, Officer Cavanaugh's testimony included the following two exchanges referencing race or ethnicity:

"[Prosecutor]: Let me ask you this. South Side Pomona, are they a predominantly Hispanic street gang?

"[Officer Cavanaugh]: Yes.

"[Prosecutor]: In the—

14

"[Defense counsel]: Your Honor, there's an objection. It would be pursuant to [the RJA]. I'll submit at this time.

"[The court]: All right. Overruled.

"[¶] . . . [¶]

"[Prosecutor]: Does [the rule against 'snitching,' i.e., cooperating with law enforcement,] apply to all criminal street gangs that you're aware of or just the South Side Pomona gang?

"[Officer Cavanaugh]: Every gang I've investigated.

"[Prosecutor]: That rule seems to be transcendent, meaning it's the same throughout criminal street gangs here in Los Angeles County or outside of [Los Angeles] County. Is that true?

"[Officer Cavanaugh]: Yes. Not only Hispanic but African American, Asian, all of them have the code of silence they are referring to as far as not snitching as you said.

"[Prosecutor]: Understood."

### D. The Jury's Deliberations

The jury began deliberating on a Wednesday and returned their verdicts on the following Monday. During deliberations, the jury requested to re-review portions of the surveillance footage. The jury then informed the court that it was split and believed it could not reach a verdict. To aid the jury, the court permitted the prosecution and the defense to make supplemental closing arguments.

After the supplemental arguments, the jurors informed the court, "We've reached another impasse of a split jury 11 to 1." But when polled, one of the 12 jurors indicated that further deliberations might be fruitful, and the court ordered the jurors to take a short break and "give it one last shot for the balance of the afternoon."

15

Following the break, the jury sent the following communication indicating it still was deadlocked: " 'We've reached another impasse where [the] jury is still split 11 to 1, with in mind a juror is adamant of not being able to decide and another that refuses to agree and wishes to continue to deliberate.' " One juror again indicated that further deliberations might be fruitful, and the court concluded it therefore "[had] no other choice" but to order the jury to return the next business day (Monday) for further deliberations.

When the jury returned to continue deliberations, the court provided the following additional instructions:

"Ladies and gentlemen, a couple of things have surfaced as a result of this communication which I can only address by referencing certain jury rules or jury instructions that may be beneficial.

"The first and foremost that I see from this communication is that one of the jurors is undecided and there's nothing wrong with being undecided or indecisive as long as that opinion is based solely upon the evidence that was presented to you during the trial, consideration of the arguments of the lawyers, certainly reliance upon the law that the court provided and even most importantly the opinions of fellow jurors that have been communicated during deliberations. And sometimes jurors are simply unable to reach [a] unanimous decision. There's nothing wrong with that, and I don't want you to think there is, but you should understand indecisiveness, what does that truly mean. It means that if you are in that position, in other words, that you have considered all the evidence in the case, you have listened to the opinions of your fellow jurors communicated to you during deliberations, you're relying upon the instructions [about] the rules of law that the court has provided and certainly considering the arguments of all counsel

16

involved[,] and after consideration of all that information you're still undecided or indecisive.

"What that translates into is that you have a reasonable doubt because you are not convinced by that information that there's proof beyond a reasonable doubt that would pave the way to a verdict.

"But indecisiveness alone in and of itself is not a third verdict. It's not an alternative verdict. It is just simply reasonable doubt if in fact you're in that position. But before you consider your indecisiveness as your final decision, please, please understand that it should be based upon all those factors and not simply a position that you took at an early stage of the case. Because if in fact that occurred[,] that a sense of pride may be aroused and that you may hesitate to change your opinion even if you are shown that it's wrong.

"You have to understand that you are not a partisan in this case. You are not an advocate. You are an independent, impartial judge of the facts. You're not taking a side for one side over the other. Your decision is going to rest solely upon facts that you extract from the evidence and the law that the court has provided and based on no other information including sympathy for one side over the other, empathy. Any type of emotion that may have been generated during your experience in this trial cannot be used as evidence. All of that must be factored out. Your decision must be based on the cold, hard evidence and the law that you have received and not from anything else. And that's really all I can say to perhaps further assist you."

The court then ordered the jurors to "go back and try one last time this morning and if things do not change, then the court will take action, what [the court] think[s] is appropriate action at that point because you have given it your all."

### E.     The Verdicts and Sentence

After engaging in the final round of deliberations, the jury found Geary guilty of the second degree murder of Espinoza and of possession of a firearm by a felon.  In addition, the jury found true that Geary "personally and intentionally discharged a firearm, a handgun, which proximately caused death to . . . Espinoza."

The trial court sentenced Geary to 40 years to life in prison and awarded him 2,017 days of presentence custody credits.

We granted Geary's motion to file a belated notice of appeal.

## DISCUSSION

### A.     Sufficient Evidence Corroborates Gabriel's Statements Implicating Geary

Geary contends we must reverse his convictions because insufficient evidence corroborates the testimony of Gabriel, an accomplice, identifying Geary as the shooter.  We disagree.

"A conviction can be based on an accomplice's testimony only if other evidence tending to connect the defendant with the commission of the offense corroborates that testimony." (*People v. McDermott* (2002) 28 Cal.4th 946, 985–986, citing § 1111.)  "The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime.  The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime.  [Citation.]" (*Id.* at p. 986.)  "The question is whether there was evidence to corroborate [Gabriel's] testimony that was legally sufficient.  ' " 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not

18

reasonably tend to connect the defendant with the commission of the crime.' " [Citation.]' [Citation.] As the trial court was required to do, we make this determination without weighing the evidence and viewing the evidence in the light most favorable to the judgment." *(People v. Pedroza* (2014) 231 Cal.App.4th 635, 650.)

Here, sufficient evidence corroborates Gabriel's testimony identifying Geary as the shooter: Two eyewitnesses testified that the rear passenger of the SUV fired the shots. Surveillance cameras captured footage of the rear passenger's face as the SUV traveled down the street. And upon reviewing the surveillance footage, Detective Freeman identified the rear passenger as Geary.

Geary insists that Detective Freeman's identification lacks evidentiary value because "Freeman was not a percipient witness" and "did not claim personal familiarity with [Geary]." Geary, however, is mistaken. Detective Freeman testified he had "personally" interacted with Geary "in the past on different investigations and on the streets, [and] on stops" dating back to 2013. Geary also is mistaken in arguing that we should discount Detective Freeman's identification because Gabriel "first identified [Geary] as the rear seat passenger shown in the video." Detective Freeman testified that he identified Geary in the surveillance footage *before* he interviewed Gabriel.

Finally, we are unpersuaded by Geary's argument that Detective Freeman's identification is suspect merely because he is part of the law enforcement agency that "arrested [Gabriel], interrogated him, and participated in negotiating a plea bargain for his testimony." Geary fails to support this argument with any legal authority.

Accordingly, we reject Geary's challenge to the sufficiency of the evidence corroborating Gabriel's statements.

**B.    The Record Belies Geary's Challenge to Admission of the Gang Expert's Testimony**

We likewise reject Geary's contention that the court abused its discretion by relying on the prosecution's incorrect characterization of Gabriel's statements in deciding to admit the gang expert's testimony.  (See *People v. Alvarez* (1996) 14 Cal.4th 155, 201 [appellate court reviews trial court's ruling concerning admissibility of evidence for abuse of discretion].)

The record does not support Geary's claim.  He is correct that, at the final pretrial hearing, the prosecutor mistakenly represented that Gabriel had told detectives that Geary was a member of the South Side Pomona gang.  But Geary ignores that, immediately before the gang expert testified, defense counsel renewed his objection to the testimony and argued the prosecution could not use any hearsay statements to establish Geary's gang affiliation.  In response, the prosecutor proffered evidence of Geary's tattoos as supporting his gang affiliation, and the court permitted the gang expert's testimony in light of that proffer.  The record thus does not support that the court relied on the prosecutor's erroneous description of Gabriel's statements in admitting the testimony.

Nor are we persuaded that the testimony was irrelevant or otherwise inadmissible because it purportedly failed to support that Geary "was a member of South Side Pomona, or . . . that he had embraced the gang's policies, practices and culture."  The gang expert testified, in pertinent part, that (1) Gabriel and Everette were South Side Pomona gang members with tattoos reflecting their allegiance to the gang, (2) Geary had similar such tattoos, and (3) Geary's tattoos were "significant" with respect to the South Side Pomona gang.

Finally, Geary is wrong that "[n]either [the gang expert] nor any other witness gave testimony about how restrictive South Side

Pomona was with regard to non-members getting tattoos of letters and the name of their hometown." The gang expert expressly testified that nonmembers of the gang cannot display such tattoos on their body without risking physical injury or death at the hands of the gang's members.

Geary thus demonstrates no abuse of discretion by the court in admitting the gang expert's testimony.

### C. Geary's RJA Claim Fails

Geary next contends we must reverse his convictions because the gang expert introduced racial bias into the trial in violation of the RJA when he testified that (1) South Side Pomona is "a predominantly Hispanic street gang," and (2) "[n]ot only Hispanic but African American, Asian, all of them [i.e., criminal street gangs] have the code of silence." Geary argues that, by "conspicuously omitting mention of 'white' gangs . . . from the universe of 'all' criminal street gangs in California," the expert's testimony "implicitly represent[ed] that Caucasians largely do not engage in violent street gang conduct, and that, as a Latino, [Geary] is a member of an ethnic group that does." We conclude, however, that the first comment does not constitute a violation of the RJA and that Geary forfeited his challenge to the second comment.

"The Legislature passed the RJA in 2020 with a stated aim 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.' [Citation.] To that end, the RJA prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national original. [Citation.]" (*People v. Wilson* (2024) 16 Cal.5th 874, 944–945 (*Wilson*).)

21

Section 745, "[t]he central provision of the RJA" (*Wilson, supra,* 16 Cal.5th at p. 945), sets forth several "categories of conduct which, if proven by a preponderance of the evidence, establish a violation." (*People v. Stubblefield* (2024) 107 Cal.App.5th 896, 911 (*Stubblefield*), review granted Mar. 12, 2025, S289152; see § 745, subd. (a)(1)-(4).) As relevant here, a violation occurs when "an expert witness . . . exhibit[s] bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(1).) A violation likewise occurs when "[d]uring the defendant's trial, in court and during the proceedings, . . . an expert witness . . . use[s] racially discriminatory language about the defendant's race, ethnicity, or national original, or otherwise exhibit[s] bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2).) But "[t]his paragraph does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (*Ibid.*)

" 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (§ 745, subd. (h)(4).)

Geary fails to demonstrate the expert exhibited improper bias or used racially discriminatory language when he testified

that South Side Pomona is "a 'predominantly Hispanic [street] gang.'" Although Geary contends the "characterization of South Side Pomona as a 'Hispanic' gang" was "gratuitous," the testimony was directly relevant to the prosecution's theory of motive and to the disputed issue of the identity of the shooter, whom a lay eyewitness had described as "Mexican or Latino." (Cf. *Stubblefield*, *supra*, 107 Cal.App.5th at p. 919 [concluding the prosecutor's comments in that case violated the RJA and observing "[t]he prosecutor did not use [the defendant's] race as an incidental fact that might make it relevant under a racially neutral theory—for example, as evidence supporting a witness's identification of a suspect"].)

And Geary forfeited his challenge to the expert's comment concerning "Hispanic[,] . . . African American, [and] Asian" gangs by failing to raise the challenge before the trial court. (See *People v. Lashon* (2024) 98 Cal.App.5th 804, 812, review den. Apr. 17, 2024, S283852; *id.* at pp. 816 & 812 [rejecting argument that the defendant's claim under the RJA presented a "pure question of law," and concluding that review of an RJA claim "like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court"]; *People v. Lawson* (2025) 108 Cal.App.5th 990, 1000–1001 [collecting appellate decisions agreeing with *Lashon* and observing that no published case has disagreed with the decision].) We are not persuaded that any exception to the forfeiture rule applies here. Geary urges an objection "would have been futile given that the trial court overruled [his] objection [under the RJA] to the prosecutor's question about the ethnicity of the South Side Pomona gang." But defense counsel made the earlier objection during a line of questioning on an entirely different topic, and Geary concedes that nothing in the court's demeanor suggested

it would overrule all objections under the RJA as a matter of course. (Cf. *People v. Gomez* (2018) 6 Cal.5th 243, 287 [claims not forfeited where trial court's demeanor "suggest[ed] that [it] would have rejected any objection to the [challenged] testimony"].)

We therefore are not persuaded that the RJA requires reversal of Geary's convictions.

### D. The Trial Court Did Not Coerce the Jury's Verdict

We also are unpersuaded that the instruction the court provided before ordering the jury to engage in a final round of deliberations (see *ante*, at pp. 17–18) amounted to an impermissible, coercive *Allen* charge.

In *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*), "our Supreme Court addressed the instruction commonly called the ' "*Allen* charge" ' or the ' "dynamite charge," ' which was approved by the United States Supreme Court in *Allen v. United States*[, *supra*,] 164 U.S. 492 . . . and subsequently adopted in many states. [Citation.] The California Supreme Court found that the 'first and most questionable feature' of the *Allen* charge was 'the discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views.' [Citation.] As paraphrased in part by the United States Supreme Court, the admonition stated, 'a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself.' [Citation.] [¶] The *Gainer* court disapproved the *Allen* charge because the instruction violated the defendant's right to a jury decision based upon the evidence and arguments presented at trial. [Citation.] As the California Supreme Court later reiterated, the 'principal flaw in the *Allen* charge at issue in *Gainer* was that, by counseling minority jurors to consider the majority view,

24

whatever it might be, the instruction encouraged jurors to abandon a focus on the evidence as the basis of their verdict.' [Citation.] Additionally, the court determined that the defendant's right under the California Constitution [citation] to a unanimous verdict of a jury of 12 persons was violated by the *Allen* charge, because it encouraged the minority jurors to acquiesce in the verdict reached by the majority without exercising their independent judgment. [Citation.]

"In disapproving the *Allen* charge, our Supreme Court ruled that 'it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried. . . .' [Citation.]" (*People v. Whaley* (2007) 152 Cal.App.4th 968, 980–981, fns. omitted.)

Here, the instruction the court provided did not display the offending features of an *Allen* charge. The court did not encourage the juror in the minority to consider the numerical division of the jury or to abandon a focus on the evidence. To the contrary, the court instructed that the juror's decision must be "based solely upon the evidence that was presented . . . during the trial, consideration of the arguments of the lawyers, certainly reliance upon the law that the court provided and even most importantly the opinions of fellow jurors that have been communicated during deliberations. . . . [¶] . . . [¶] . . . Your decision must be based on the cold, hard evidence and the law that you have received and not from anything else." Further, the court emphasized that "sometimes jurors are simply unable to reach [a] unanimous decision," and "[t]here's nothing wrong with that."

We therefore reject Geary's contention that the court's instruction coerced the jury's verdict.

### E. Geary's Cumulative Error Claim Fails

Because Geary has failed to establish any individual errors, his cumulative error argument necessarily fails. (See *People v. Butler* (2009) 46 Cal.4th 847, 885 [no finding of cumulative error where there were no substantial individual errors].)

### F. Geary Is Entitled to One Additional Day of Custody Credit

Finally, we agree with the parties that the trial court must correct the abstract of judgment to reflect that Geary is entitled to 2,018 days of presentence credit. The court granted Geary only 2,017 days of credit. Geary, however, was arrested on October 2, 2018, and sentenced on April 10, 2024. He therefore is entitled to 2,018 days of presentence custody credit. (See *People v. Fuentes* (2022) 78 Cal.App.5th 670, 681 [" '[a] defendant is entitled to credit for all days in presentence custody including the day of arrest and the day of sentencing' "].)

26

## DISPOSITION

The judgment is affirmed.  On remand, the trial court is directed to prepare an amended abstract of judgment that awards Geary 2,018 days of presentence custody credit.  The court shall forward the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:



WEINGART, J.



M. KIM, J.